## THE STATE v. JOHN KING, Appellant.

### Division Two, May 14, 1907.

1. **THREATS: Evidence.** It was not error to admit in evidence threats made by defendant against deceased a week or two prior to the homicide.

2. **INSTRUCTION: Self-Defense: Requested by Defendant.** Where, as in this case, the court has already fully instructed on the law of self-defense, there is no error in refusing an instruction, requested by defendant, embodying the same proposition.

3. ——: ——: **Evidence.** Under the facts as detailed by defendant himself, and by the State's witness, there was no call for an instruction on self-defense.

4. ——: **Conspiracy: Assault: No Request.** There was no error in the court's failure to instruct as to the effect of a conspiracy followed by an assault upon defendant, for the reasons, first, there was no proof of such a conspiracy followed by an assault, and if there had been, the court's instruction on self-defense fully covered the law in that regard; and, second, the court's attention was not called to its failure to instruct on that point.

5. **FIRST DEGREE MURDER: Sufficiency of Evidence.** Evidence held sufficient to justify the verdict finding defendant guilty of murder in the first degree.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey*, Judge.

AFFIRMED.

*John E. Bowcock* for appellant.

The error complained by by appellant arises from the failure and refusal on the part of the court to instruct the jury as to the effect of a prior conspiracy followed by an assault made upon the appellant at the instigation of the deceased, as characterizing the feeling and the intentions of deceased towards appellant, as well as explanatory of the justifiableness on the part of appellant to act upon a slighter appearance of danger than he would where threats only had been made against him unaccompanied by any attempt to put the same into execution, the court simply leaving the jury under the impression that threats and an assault, no matter how dangerous the assault was intended to have been, were synonymous in law, whereas it was the duty of the court to have fully instructed the jury upon all the law applicable to all the material facts in the case as required by Laws of 1901, page 140. State v. Patrick, 107 Mo. 147; State v. Nelson, 118 Mo. 124; State v. Weakly, 178 Mo. 413.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) Defendant's counsel made objections to certain threats which State's witness Douglass testified that defendant made against deceased. This witness testified that said threat was made a week or two before Thanksgiving, and this homicide was committed on the 28th day of November. It is clear, therefore, that the threat was sufficiently recent to be of evidentiary value in this case. State v. Callaway, 154 Mo. 91; Underhill on Crim. Evid., secs. 328 and 333; 1 Wigmore on Evidence, sec. 108. (2) No instruction on the subject of self-defense was necessary, as the evidence fails to show that, in any aspect of the case, defendant acted in self-defense. The two eyewitnesses,

who were called in behalf of the State, testified that defendant shot deceased in the back; that she fell on her face to the sidewalk, and that defendant continued to shoot. Dr. Abeken testified to finding four wounds in the body of deceased, all of which entered from the rear. While the defendant testified to the effort deceased made to draw a pistol, that she was turning as if to come towards him; yet his evidence is contradicted by the physical facts in the case. If deceased had turned to come towards defendant, or if she was turning around, the bullets could not possibly have entered her back in the way they did. Upon the reasonableness of the testimony, this court, in State v. Dettmer, 124 Mo. 435, said: "When witnesses attempt to establish a certain theory by their testimony, they must first look to it well that their testimony must not go counter to the physical facts in the case; for if it does, neither courts nor juries are required to stultify themselves by disbelieving the immutable physical facts in the case, and so we have said on a number of occasions." State v. Turlington, 102 Mo. 642; State v. Bryant, 102 Mo. 24; State v. Anderson, 89 Mo. 332; State v. Nelson, 118 Mo. 124; State v. Nocton, 121 Mo. 537; State v. Fraga, 97 S. W. 900. But even if this court shall conclude that an instruction on self-defense was proper, it will be seen that the State's instruction on that subject was full and fair, and all that the defendant was entitled to. State v. Gee, 85 Mo. 647; State v. Pennington, 146 Mo. 35. It was not error to refuse an instruction asked by defendant, when another instruction had been given by the court on the same subject and embodying the same proposition of law. (3) The evidence is more than sufficient to justify a conviction of the defendant of murder in the first degree. State v. Reed, 117 Mo. 604; State v. Garth, 164 Mo. 553; State v. Callaway, 154 Mo. 91; State v. Eaton, 191 Mo. 51; State v. Worton, 139 Mo. 526.

GANTT, J.—From a conviction of murder in the first degree in the circuit court of the city of St. Louis, the defendant has appealed to this court. The prosecution was begun by an information filed by the circuit attorney on January 5, 1906, in which the defendant was charged with the murder of Hallie Douglas, a young woman about twenty years of age, on the 28th of November, 1905. The defendant, the deceased, and nearly all of the witnesses were negroes.

On the part of the State the testimony tended to show that the defendant and the deceased had been on friendly and intimate terms for some time, and until within a few days of the homicide. On the afternoon of the homicide, the deceased was at the residence of Max Anderson, another negro, on Gratiot street. At that time Max Anderson, Bud Anderson, Chas. Franklin, Hallie Douglas and Mabel Douglas, all negroes, were at the house of Max Anderson and his mother on Gratiot street. The defendant passed this house and looked in at the window, and in a few minutes returned and knocked on the door. It seems that Max Anderson suspected that defendant's mission was anything but friendly and before opening the door got his pistol and then admitted the defendant. The defendant at once addressed himself to the deceased, Hallie Douglas, and requested her to come out of the house, as he wanted to see her, and she replied, "Go ahead, I am coming out," but did not start at once to go. At this point the defendant had his hand in his pocket and started to draw a pistol; when he made this motion, Max Anderson drew his pistol on the defendant and ordered Franklin to take the gun out of defendant's pocket and said to the defendant, "What do you mean by coming in here and pulling out a gun?" and struck defendant on the side of the head with the pistol, knocking defendant to the floor and discharging Anderson's pistol. Defendant was not shot but it seems

he thought he was.    Anderson then commanded him
to get up, that he was not hurt, and after some parley
either Anderson or Franklin withdrew the cartridges
from the pistol of defendant and gave it back to him.
Defendant then left Anderson's house.    The deceased
and her sister Mabel also left the house and went to
the Four Courts to swear out a warrant for the de-
fendant, but reached the office of the warrant clerk too
late in the afternoon and they then started to return
to their home.    The defendant followed them down to
the Four Courts and quarrelled with them and said
he would give them something to swear out a warrant
for.    The deceased and her sister started up Clark av-
enue to Thirteenth street and defendant walked along
the street with them.    The deceased and her sister then
continued their way towards their  home  and  when
they reached Twenty-first and Papin streets they dis-
covered defendant coming from  Twenty-second and
Papin towards the bridge on Papin  street;  when
they discovered him he was hurrying towards them,
and they ran over on Twenty-first street to Chouteau
avenue and on Chouteau to the grocery store of Class
on the corner of Chouteau and Twenty-second; there
the deceased and her sister separated, the deceased go-
ing into the grocery store and her sister going on to
her home.    The deceased remained in this store until
her mother came.    While the deceased was waiting in
the grocery store, the defendant came in and ap-
proached her where she was sitting by the counter, and
was heard by Mr. Elmore, a clerk in the store, to say
that he intended to have a warrant issued for the ar-
rest of the deceased.    Beyond this nothing unusual oc-
curred in the store.    When the deceased's mother came
up to the front door of the store she either called or
motioned to the deceased to come to her and the de-
ceased got up off of the stool, walked to the front door
and got out on the sidewalk and turned with her mother

to go west in the direction of their home. The defendant also went out of the front door of the grocery store and started in the opposite direction; after taking a few steps, the defendant wheeled around, drew his pistol and followed the deceased and her mother, and when within about five feet of the deceased, shot her in the back, and when she fell to the sidewalk, stood over her and fired four more shots into her person. Death was almost instantaneous.

The evidence on the part of the State was conclusive that the deceased had no pistol, said nothing about a pistol, made no threats or motion indicating that she was trying to draw one. After killing the deceased the defendant walked to the corner of Twenty-second street and Chouteau, turned on Twenty-second street and went about a block distant, broke down his pistol and threw out the empty shells. He then went to a near-by police station and surrendered himself. Autopsy was held on the body of the deceased by doctor Abeken, the surgeon in charge at the coroner's office, from which it appeared that the deceased was shot in the back, twice in the forearm and once through the upper part of the body through the chest. The shot that entered the back from the back and came out through the left side of the neck was the mortal wound from which the deceased died. The physician testified that an examination of the body showed that it was wholly normal in all other respects. There was also evidence that the defendant had made divers threats towards the deceased to the effect that, if she turned him down, he would kill her.

The defendant testified in his own behalf and detailed the difficulty at Max Anderson's house on the afternoon of the homicide and claimed that Anderson was the aggressor, and that defendant had gone to the Four Courts for the purpose of having Anderson and his household arrested, but found the clerk's office

closed, and that on his return home he saw the deceased sitting on a stool in Class's grocery store, and she beckoned him to come in; that he went in and told her he intended to have her arrested for carrying a pistol, and that he then and there saw the shape of a pistol in the bosom of her dress; that her mother then appeared at front door of the grocery store and beckoned the deceased to come out; that he and the deceased left the store about the same time and walked in opposite directions; that he heard the deceased's mother say, "Why don't you kill the black s— of a b—; what have you got your gun for?" that he looked back and saw deceased turning around and trying to draw a revolver from her bosom; that it was then, and not until then, he drew his pistol and shot the deceased; that he was frightened and excited and did not know how many shots he fired, but denied that he fired any after she had fallen.

Defendant introduced one witness, Jesse Hulbert, another negro, who testified that on the Sunday night before the homicide on Tuesday, the deceased and the defendant came to his house, number 2120 Chestnut street, about half past eleven o'clock and stayed until twelve; that when they came it appeared as if they had had a squabble before they got there. While there the defendant upbraided the deceased for going down to Gratiot street after he had been so good to her and she replied, "Nobody can make me have anybody if I don't want to." That she thereupon said, "To-morrow I am going to get me a 38," and witness asked her, "What are you going to get a 38 for?" and she said, "I have got $3.50 at home, and I am going to get me a 38 with it and I will fix King." After she said this, the defendant said he would go, and he and the deceased left together. There was also evidence tending to show that the deceased was the mistress of the defendant. He testified that he had regularly supplied

her with money from his wages for sometime previous to the homicide. At the close of the evidence the court instructed the jury upon murder in the first degree, murder in the second degree and self-defense and upon threats by the deceased against the defendant, and also gave the usual instructions on the presumption of innocence, credibilty of witnesses and reasonable doubt.

1. The information in this case was in all respects, save as to the name of the defendant and the deceased, in the form approved by this court in State v. Gray, 172 Mo. 434, 435, and State v. Wilson, 172 Mo. 420. The indictments in both of said cases received the approval of this Court in Banc, and have often since been approved by this Division.

2. There was no error in the admission in evidence of the threats made by the defendant against the deceased a week or two before Thanksgiving, 1905. The homicide occurred on November 28, 1905. [State v. Callaway, 154 Mo. 91.] The trial court was exceedingly careful in guarding the rights of the defendant as to other threats which the State sought to get before the jury. And also in excluding evidence tending to show that the defendant had been convicted of an assault with intent to kill prior to the homicide. Indeed, a careful examination of the whole record discloses no error in the admission or rejection of testimony; where there was a doubt, the court resolved it in favor of the defendant. The only errors assigned by the defendant in this court relate to the failure and refusal of the court to instruct and not as to any alleged errors in the admission or rejection of testimony.

3. As already said, the court instructed on both degrees of murder, and as those instructions are full and complete and such as have uniformly received the approbation of this court, it is deemed unnecessary to burden the reports with their reproduction. In its

instruction numbered 4, the court directed the jury as follows:

"The defendant admits the shooting, but claims he acted in self-defense. Upon this question the court instructs you that if you find from the evidence that when defendant shot the said Hallie Douglas, he had reasonable cause to believe and did believe that said Hallie Douglas was about to take his life or do him some great personal injury, and further, that he had reasonable cause to believe and did believe that it was necessary for him to so shoot said Hallie Douglas in order to protect himself from such danger, then he ought to be acquitted on the ground of self-defense. Whether defendant had reasonable grounds to believe that such danger existed, and whether he shot said Hallie Douglas in the honest belief that it was necessary for the protection of his life or person, are questions which you must determine from all the evidence in the case. Although defendant may have really believed himself to be in danger, yet he cannot be acquitted on the ground of self-defense unless it further appears from the evidence that he had reasonable cause for such belief. On the other hand, even if no real danger existed, yet if the defendant had reasonable ground to believe and did believe that it existed, he would be justified in acting upon such belief. If you believe from the evidence that the defendant shot the deceased, Hallie Douglas, unnecessarily, and when he did not have reasonable cause to believe that the deceased was then about to kill him or do him some great bodily harm or personal injury, then there is no self-defense in the case, and you cannot acquit the defendant on that ground." And in the same connection gave instruction numbered 5, as follows:

"In determining whether the defendant was justified in acting upon appearances and shooting the deceased, the jury may take into consideration any

threats that may have been made by deceased against the life of the defendant and communicated to defendant prior to the killing, if the jury find from the evidence that any such threats were made and communicated. You shall consider all the threats which you may believe from the evidence were made by the deceased against the defendant, and may give them such weight in determining the nature of the transaction giving rise to the charge for which the defendant is now on trial as you deem proper. Mere threats, however, will not justify on the ground of self-defense the shooting of one by another, nor will threats alone warrant the party against whom they are made in attacking and killing the party who made them, unless at the time of the shooting the party making such threat or threats does some act indicating a purpose to execute the same or that the party against whom they are made then has reasonable ground to believe and does believe such threat or threats are about to be executed.''

The defendant complains of the refusal to give the following instruction asked in his behalf:

''The defendant admits the shooting of the deceased, Hallie Douglas, but claims that he acted in self-defense. Upon this question the court instructs you that if you find from the evidence that when the defendant shot and killed Hallie Douglas he had reasonable cause to believe that the said Hallie Douglas was about to take his life or do him some great personal injury, in this connection the jury may take into consideration any threat or threats that the deceased may have made towards the defendant (if you believe that she made such threat or threats); and that when the defendant shot and killed the deceased he honestly believed that the said Hallie Douglas had upon her person a revolver, and further believed that the deceased at the time and place intended and was about to put

said threat into execution, and that it was necessary for him to shoot the said Hallie Douglas, in order to protect him from such danger, then he ought to be acquitted on the ground of self-defense. Whether defendant had reasonable ground to believe that such danger existed, and whether he shot the said Hallie Douglas in the honest belief that it was necessary for the protection of his life or person, are questions which you must determine from all the evidence in the case. Although defendant may have believed himself to have been in danger, yet he cannot be acquitted on the ground of self-defense, unless it further appears that he had reasonable cause for such belief. On the other hand, even if no real danger existed, yet if the defendant had reasonable ground to believe and did believe that it existed, he would be justified in acting upon such belief. If you believe from the evidence that the defendant shot the deceased unnecessarily, and when he did not have reasonable cause to believe that the deceased was then about to kill him or do him some great bodily harm or personal injury, then in that event there is no self-defense in the case, and you cannot acquit the defendant on that ground.''

A comparison of instruction numbered 4 given on behalf of the State, with the refused instruction asked by defendant, will demonstrate that the court in its instruction numbered 4 had already fully instructed the jury upon the law of self-defense, and there was no error in refusing to repeat the instruction embodying the same proposition of law. [State v. Easton, 138 Mo. 103.] In our opinion, the facts of the case as detailed by the defendant himself, to say nothing of the overwhelming proof to the contrary by the disinterested witness, Mr. Elmore, for the State, did not call for an instruction on the law of self-defense. The evidence of the surgeon who made the post-mortem examination, establishes the fact that all four of the

wounds inflicted by the defendant upon the deceased
entered her person from the rear, and the evidence
shows that the deceased and her mother were peace-
fully wending their way towards their home, and the
defendant had started in the opposite direction and of
his own accord faced about and followed the deceased
and shot her in the back without any provocation what-
ever. His testimony as to her attempting to draw a
pistol is completely rebutted by the physical facts in the
case. Besides, the whole evidence shows that the de-
ceased had no weapon on her person at the time she
was shot. It has often been said by this court that
neither courts nor juries are required to stultify them-
selves by rejecting the immutable facts in a case. [State
v. Turlington, 102 Mo. 642; State v. Nelson, 118 Mo.
124; State v. Fraga, 199 Mo. l. c. 136.]

In the brief of the learned counsel for the defend-
ant, however, it is said that the failure of the court to
instruct the jury as to the effect of a prior conspiracy
followed by an assault upon the defendant as tending
to characterize the feeling and intention of the de-
ceased towards the appellant and thus justifying him in
acting upon slighter pretense of danger, was error.
Two reasons appear to us why no error occurred in this
respect. The first is, there was no proof of such a con-
spiracy followed by an assault, and if there had been,
the instruction of the court on self-defense fully covered
the law in that regard; and, secondly, the court's at-
tention was not called to any failure to instruct on that
point of law. [State v. Bond, 191 Mo. l. c. 563; State
v. McCarver, 194 Mo. l. c. 742.] In our opinion, the
court fully and fairly instructed upon every proposi-
tion of law arising upon the evidence in the case, and
in giving the instruction on self-defense was more fa-
vorable to the defendant than the facts justified, but of
this, of course, the defendant cannot complain, as it
was an error, if any, in his favor.

4.   A careful and critical examination of the tes-
timony in this case discloses that the jury was fully
justified in returning a verdict of murder in the first
degree.   It demonstrates that the defendant, actuated
by jealousy, deliberately followed the deceased, after
threatening to kill her, into the grocery store on Chou-
teau avenue whither she had fled for safety from him;
that after her mother had come to the store to protect
her and take her home, the defendant without the slight-
est provocation, without a word being spoken, turned
from his course to the east and rapidly approached her
and shot at her five times, inflicting four wounds from
the rear.   The deceased was entirely unarmed and was
making no demonstration, and, the evidence would
show, was wholly unaware of the approach of the de-
fendant until he shot her.   After his victim had fallen
to the sidewalk, he wantonly fired three more shots into
her prostrate body.   Indeed, all the evidence evinces
such a willful, deliberate, premeditated and malicious
homicide on the part of the defendant, that the jury
could not have reasonably reached any other verdict in
the case.   The verdict and the sentence of the trial court
must be affirmed and the sentence which the law pro-
nounces is directed to be carried into execution.

*Fox, P. J.,* and *Burgess, J.,* concur.