## THE STATE v. RICHARD T. GOLDSBY, Appellant.

### Division Two, December 15, 1908.

1. **MANSLAUGHTER: Provocation.** Words alone, however insulting or aggravating, will not reduce the killing to manslaughter, because such words do not furnish adequate cause for passion.

2. ————: **Involuntary.** To reduce a homicide to manslaughter in the fourth degree, the killing, under the statute, must be involuntary.

3. ————: ————: **This Case.** Defendant and deceased quarreled over the settlement of an account, and defendant testified that deceased became angry when he refused to give him ten dollars, and said, "If you don't do it, I will kill you," and ran his hand in his overcoat pocket and defendant went behind the bar; that thereupon deceased produced a pistol, and defendant reached for his revolver, lying on a safe under his overcoat, and commenced shooting at deceased, but defendant was unable to say whether he or deceased shot first, and the evidence is not otherwise clear upon that point. *Held*, that the killing was not involuntary, and there was no room in the case for an instruction on manslaughter in the fourth degree, nor on any degree of homicide except murder in the second degree, and on no theory of defense except justifiable homicide.

4. **INSTRUCTIONS: Covering All Questions.** If defendant desired further instructions covering some features of the case, it was his duty to call the court's attention to any questions of law arising in the case upon which the court had failed to instruct, and to except at the time to the court's failure to give the instructions he deemed necessary.

Appeal from St. Louis City Circuit Court.—*Hon. Geo. H. Williams*, Judge.

AFFIRMED.

*Thomas B. Harvey, Willis H. Clark* and *William E. Fish* for appellant.

(1) The court should have given an instruction for manslaughter in the fourth degree, upon the theory

that the jury may have concluded from the evidence
that there was no absolute necessity for the killing,
but that there was a demonstration of violence against
appellant, accompanied with abusive language and a
conditional threat, the effect of which was to produce
that passion and hot blood which is inconsistent with
murder and reduces the homicide to manslaughter.
Deceased was the aggressor throughout, and his effort
to coerce appellant with a pistol to give him ten dollars
was certainly as much physical violence as striking
or attempting to strike with the hand or as twitching
one's nose, and would undoubtedly be as likely to pro-
duce that alarm, resentment and hot blood, denominat-
ed by the law as passion and which takes the homicide
out of the category of murder. 2 Bish. Crim. Law
(6 Ed.), sec. 704; State v. Elliott, 98 Mo. 156; State
v. Branstetter, 65 Mo. 153; State v. Howard, 102 Mo.
147; State v. Garrison, 147 Mo. 556; State v. Mc-
Kenzie, 177 Mo. 710. (2) The court should have in-
structed for self-defense against the felony of taking
from defendant his property by fear or personal vio-
lence. The court's instruction told the jury that it
must have been necessary to shoot in order to pro-
tect himself, whereas it was only necessary to give up
the ten dollars demanded. The jury could and proba-
bly did so conclude from the character of the court's
instruction, and by reason of the absence of any other
instruction upon this subject. It would be superfluous
to cite authorities in support of the fundamental propo-
sition of the right of defense against the forcibly tak-
ing one's property.

*Herbert S. Hadley,* Attorney-General, and *N. T.
Gentry,* Assistant Attorney-General, for the State.

(1) As to the failure of the court to fully instruct
the jury, it may be said that defendant cannot now com-

plain of such failure, as he did not specifically call the court's attention thereto at the time. If he desired to have the court instruct on any particular subject, he should have specifically stated that to the court at the time; his saving a general exception is insufficient. State v. Weatherman, 202 Mo. 11; State v. Bond, 191 Mo. 555. (2) Where there is substantial evidence tending to show defendant's guilt, this court will not attempt to weigh the evidence, but will defer to the finding of the jury as approved by the trial court. State v. Smith, 190 Mo. 706; State v. Payne, 194 Mo. 442; State v. Groves, 194 Mo. 452; State v. Williams, 186 Mo. 128.

BURGESS, J.—On May 29, 1907, the grand jury of the city of St. Louis returned an indictment against the defendant, a negro, charging him with murder in the first degree for the shooting and killing of one Oscar Shanklin, in said city. Trial was had on the 27th day of June, 1907, and the defendant was convicted of murder in the second degree, his punishment being assessed at ten years in the penitentiary. Defendant filed motions for a new trial and in arrest of judgment, which were overruled, whereupon he appealed.

The evidence for the State was to the effect that Oscar Shanklin was shot by the defendant on December 11, 1906, at the defendant's saloon, in St. Louis, and died from the wounds inflicted in a short time.

Sam Medlock, a nephew of the deceased, testified for the State that the deceased and defendant, up to about four weeks before the shooting occurred, had been partners in said saloon, but that there was considerable friction between the men over the running of the business, as a result of which the defendant purchased all of Shanklin's interest in the saloon.

The State produced but one eye-witness to the

shooting, Robert T. Scott, a negro, bartender in the saloon at the time. He testified that besides himself, there were in the saloon at the time Tom Smith, William Marshall, deceased and defendant; that between eight and nine o'clock that evening he saw the deceased and defendant standing outside the bar and close to a cigar case which was on top of the bar, and that he saw the deceased writing something on a piece of paper on the top of the cigar case; that about this time William Marshall came into the saloon and began talking to him, Scott, and that Marshall was in the act of leaving when the shooting occurred. Witness did not know what the deceased was writing, but he saw the defendant leave the deceased and walk around behind the bar. With reference to the shooting, Scott testified as follows: "Shanklin was leaning on the cigar case, and I heard him say to Goldsby, 'If you don't do' something—I didn't catch what he said—'I will do'—something. I couldn't hear just what he said. He put his hand in his right hand coat pocket, and said something to Goldsby, and then that shooting began, and I don't know who began it, it started so quick. I saw Shanklin fall on his back, and I didn't know whether he had a gun or not. He had something in his hand; I saw something shine; he seemed to be grabbing at it, and it was shining; but he fell on his back, and this fellow, Tom Smith, started to run out, and Goldsby said, 'Don't any of you leave here; you see he has got a gun in his hand.' I didn't know who was the one that done the shooting. I knew, of course, that Goldsby done some of the shooting, and I knew this man was shot, but I didn't know if he done it at all. I saw Goldsby with a revolver in his hand. I think I saw him fire some shots; I could see that he shot. The shots were all fired in quick succession; I don't suppose there was over four or five, as near as I can get at it. I cannot say that I saw Shanklin fire any."

This witness also testified that after Shanklin fell he saw the handle of a revolver protruding from the inside pocket of Shanklin's overcoat. He further testified that the day after the shooting he found what appeared to him to be a bullet hole in some wood work immediately behind where the defendant was standing at the time of the shooting.

Officer Hughes arrived on the scene soon after the shooting took place. The officer took the defendant's revolver away from him, and then went to the deceased, who was lying on the floor, and found a revolver in the left inside pocket of his overcoat. Four chambers of this revolver contained loaded cartridges, and one contained an empty shell. The officer testified that this empty shell had been fired some time before. The defendant's revolver was offered in evidence at the trial, also the revolver taken from the pocket of the deceased; but the empty shell, which the officer testified was old and blue-moulded, was not produced at the trial, nor was its absence accounted for by the State. Officer Hughes also testified that Goldsby did not make any statement to him that Shanklin had a weapon in his hand and started to fire before Goldsby began shooting.

Dr. John C. Lebrecht, who held a post-mortem examination over the body of the deceased, testified that he found two bullet wounds on the body, one of which was in the left wrist; the other penetrating the abdomen, and passing through the left lobe of the liver. He testified that deceased died of hemorrhage of the liver, as a result of the latter wound.

William Marshall testified for the defendant that he was in the saloon and was just starting to leave when the trouble commenced. He saw Shanklin backing away from the cigar case, and heard him say to Goldsby, "If you don't do it I will kill you;" that Shanklin had a gun and was making some motions

with his hands, and that Goldsby ducked down behind
the cigar case, and came up with his gun, shooting;
that there were four or five shots fired, but he did not
know how many each one fired, or whether Shanklin
fired any; that, after the shooting, Goldsby asked that
nobody go out, and made the statement that Shanklin
had a gun.    This witness also testified that the day
after the shooting he saw a bullet mark in the back-
bar, as testified to by witness Scott.

The defendant testified that he and the deceased
had been partners in the saloon, and that on account
of their disagreements as to the running of the busi-
ness, he purchased the interest of the deceased in the
saloon, receiving from him a bill of sale, which bill
of sale was offered in evidence.  He further testified
that the deceased came to the saloon that evening,
which was about twenty days after the sale, and wanted
of him ten dollars, saying that he, the defendant, owed
him that much on their settlement.  After considerable
talking, the defendant agreed to pay the deceased that
sum if the deceased would give him a receipt for the
same.  The deceased then, while he and the defendant
were standing outside the bar, by the cigar case, took
a pencil and paper and began writing something.  The
defendant was unable to read what the deceased had
written, and he declined to pay the ten dollars.  This
seemed to anger the deceased, and the defendant said
he would pay the ten dollars if the deceased would get
some one to write a proper receipt, otherwise not.  The
deceased then said, ''If you don't do it, I will kill you,''
and ran his hand in his overcoat pocket, whereupon
the defendant left him and walked behind the bar.
The deceased produced a pistol, and the defendant
reached for his revolver, lying on the safe under his
overcoat, and commenced shooting at the deceased.
He, the defendant, was unable to say whether he or
the deceased fired the first shot, but he was sure that

he ducked behind the bar when the deceased first showed his pistol.

The defendant had previously lived in Vicksburg, and he produced at the trial the depositions of a number of citizens of Vicksburg, testifying to his good reputation as a peaceable and law-abiding man.

Defendant's main contention is that the court committed error in failing to instruct the jury upon manslaughter in the fourth degree, upon the theory that the jury might have concluded from the evidence that there was no absolute necessity for the killing, but that there was a demonstration of violence towards the defendant, accompanied with offensive language and a conditional threat, the effect of which would be to produce passion and hot blood, and reduce the homicide to manslaughter in the fourth degree.

Section 1833, Revised Statutes 1899, provides that "the involuntary killing of another by a weapon, or by means neither cruel nor unusual, in the heat of passion, in any case other than justifiable homicide, shall be deemed manslaughter in the fourth degree."

No principle of law is better settled than that words alone, however insulting or aggravating, will not reduce the killing to manslaughter, because such words do not furnish adequate cause for the passion. [State v. Branstetter, 65 Mo. 153; State v. Elliott, 98 Mo. 150.] The killing in this case was not involuntary, as it must be, under that statute, to reduce it to manslaughter in the fourth degree.

In the case of State v. Elliott, supra, upon which the defendant chiefly relies, the circumstances connected with the killing were not inconsistent with the testimony of the defendant that it was not his purpose to kill the deceased. The court said: "There is, therefore, abundant evidence tending to show that the killing was without a design to effect death. It is also clear that the evidence tends to show that the

defendant acted from a passion suddenly aroused; but the passion to be of any avail to him must have arisen from an adequate cause.'' Under these circumstances, the court held that the trial court should have instructed for manslaughter in the third degree, under section 3471, Revised Statutes 1889 (Sec. 1828, R. S. 1899).

We are of opinion that the testimony of the defendant in this case would not warrant the giving of an instruction upon any grade of homicide other than that of murder in the second degree; nor would his testimony authorize the giving of an instruction on manslaughter in any degree. It was sufficient to justify the court in giving the instruction on justifiable homicide, and nothing more. If the defendant shot the deceased to prevent the deceased from shooting him, then he was guilty of no offense, the shooting being done in self-defense.

It is not contended by counsel for defendant that the facts and circumstances in evidence warranted an instruction on manslaughter in any degree other than the fourth. In State v. Jones, 79 Mo. 441, it is said: ''Manslaughter in the fourth degree is the involuntary killing of another in the heat of passion, or any homicide which would be manslaughter at common law, and which is not excusable nor justifiable, or is not declared to be manslaughter in some other degree.'' As was said by the court in that case, so may we say as to the case at bar: ''There was no sudden heat or quarrel or involuntary killing, bringing the case either under section 1249 or 1250, Revised Statutes 1879'' (now secs. 1833, 1834, R. S. 1899); nor was the killing manslaughter at common law.

In State v. Branstetter, 65 Mo. 149, where the killing was intentional, as in this case, the reason for holding that the trial court should have instructed for

manslaughter in the fourth degree was predicated upon the facts of the case.

The evidence in this case clearly shows that the killing was intentional. According to Mr. Bishop, when the killing is intentional, and is not lawful, it is generally murder; but under circumstances of provocation, or of mutual combat, it may be reduced to manslaughter. [2 Bishop's Crim. Law (6 Ed.), sec. 695.] It is true that the defendant testified to a conditional threat, but such threat will not reduce the killing to manslaughter. Sometimes words give character to acts, and are admissible in evidence to explain them; and if there be a present demonstration of violence, insufficient of itself to justify the killing or reduce the homicide to manslaughter, the accompanying words added to the physical acts may have such effect. [2 Bishop's Crim. Law (6 Ed.), sec. 704.]

According to the defendant's own testimony, he was in his saloon, standing outside the bar, when Shanklin came in and said to him that he had been figuring over the settlement between them and found that he, the defendant, owed him ten dollars. The defendant said he did not see how he owed him anything, whereupon Shanklin said, "You owe it to me, and G—d—you, if you don't give it to me I will kill you." Shanklin's hand was grasping a pistol at the time, and the defendant said he would give him the ten dollars if he, the deceased, would give him a receipt therefor. Shanklin asked for a piece of paper, and the defendant went behind the bar and laid a tablet of paper on the cigar case. The deceased scribbled something on the paper which he said was a receipt, but which the defendant was unable to read, and he suggested that Scott, the bartender, write the receipt for him. Shanklin repeated that the defendant owed him the money, and, with an oath, said, "You better pay me or I will kill you," and again produced his

pistol. The defendant then reached for his own pistol, which was lying under his overcoat on the safe, and immediately commenced shooting. He did not know how many shots he fired, nor how many the deceased fired, but said he saw him fire.

With reference to the shooting, the defendant, on cross-examination, testified as follows:

"Q. When you went behind the bar, and came back to where he was, had he cooled down?—did he make any further move? A. Sir? Q. Where was his gun?—in his coat, or did he have it out? A. He had his gun in his hand, so I could see the handle of the gun. Q. When he started to pull his gun the next time had he cooled down, or was he mad? A. No, sir, he had not. He stepped back and came up with a gun in his hand, and poked it over the show case, right towards me, and I ducked at that time. Q. What position were you in when he fired this one shot, as you claim? A. I could not tell what position I was in, any more than I was down behind the counter, shooting over. Q. He shot before you did? A. I couldn't say that, to tell the truth. Q. You saw that he shot, didn't you? A. I think he shot. Q. What makes you think he shot? A. Because I saw this bullet-hole over my head. I heard a noise that must be a shot, and this smoke all over that way; but whether I shot first I cannot say; but I am sure he shot; because I saw the smoke bush from that way."

This evidence clearly shows that the killing was neither involuntary nor done in the heat of passion, and there was, therefore, nothing upon which to base an instruction for manslaughter in the fourth degree.

It is claimed for the defendant that the court failed to instruct the jury upon all questions of law in the case. The record shows that the defendant excepted to the instructions given by the court upon the ground that they did not fully nor correctly state

the law under the evidence. We are unable to perceive, and the defendant fails to indicate, wherein the instructions are deficient, or fail to cover all the law in the case. If the defendant desired further instructions, it was his duty to call the court's attention to any questions of law arising in the case upon which the court had failed to instruct, and to except at the time in the event of the court's failure to give the instructions deemed necessary. [State v. Bond, 191 Mo. 555; State v. McCarver, 194 Mo. 717; State v. Weatherman, 202 Mo. 6; State v. West, 202 Mo. 128; State v. King, 203 Mo. 560.]

Finding no reversible error in the record, we affirm the judgment. All concur.