THE STATE v. WILLIAM LASHLEY, Appellant.—300 S. W. 732.

Division Two, December 12, 1927.

*Fred A. Bottger* and *Lee A. Hall* for appellant.

*North T. Gentry,* Attorney-General, and *J. D. Purteet,* Special Assistant Attorney-General, for respondent.

570

HENWOOD, C.—The appellant (a negro) was charged by indictment with first degree murder in the Circuit Court of the City of St. Louis. Upon trial the jury found him guilty of murder in the first degree and fixed his punishment at death. He was sentenced to hang and appealed.

The evidence spreads over a broad field of details and abounds with repetitions concerning unimportant matters. However, a full statement of the controlling facts of the case can be made within reasonable limits.

It appears from the evidence offered by the State that the victim of the alleged homicide was Sidney Sears, a lieutenant of the St. Louis police force. He had a record of distinguished service extending over a period of twenty-five years, and at the time of the unfortunate affair which resulted in his death was in charge of the homicide squad, and noted as an expert marksman with a revolver. About 2:15 in the morning of June 22, 1924, Lieutenant Sears and officers Mergelkamp and Stowell left Central District Station at 108 South 12th Street in a Buick touring car, in response to an emergency call at 1433 Papin Street, where a "cutting-scrape" was reported. The car was parked near the northeast corner of the intersection of Papin and 14th Street, fronting towards the northeast and about twelve feet from the curb line of Papin Street. The parking of the car in this fashion was due to construction work on 14th Street at this point and north of the intersection. Sears, who rode on the left side of the back seat, remained in the car, because he was not feeling well, and the other two officers got out of the car and went a short distance west on Papin Street (1433) to investigate the "cutting-scrape." Sears was dressed in plain clothes and wore a black hat. Officer Mergelkamp testified that Sears's police badge or "shield" was pinned on the outside of his coat. There was a big, bright arc light on the northeast corner of the intersection, near the front of the car. One witness for the State (Anna Gerkan) said: "You can read from the light, it is so light." Two workmen at the plant of the Merchants Ice & Coal Company (Church and Hamilton), located near the northwest corner of Papin and 13th Street, saw the officers park the car and, shortly thereafter, saw appellant approach the car from the north on 14th Street. Both of these witnesses tes-

tified that appellant walked up to the car on the right side and appeared to be carrying his right hand up close to his right side; that he placed his left hand on the car just back of the front seat and after standing there "a few seconds," "not quite a minute," he raised his right hand and fired a shot into the car; then a shot was fired from the rear seat of the car, and then appellant continued to fire a volley of shots, "but the range of fire changed just a little;" then appellant walked around the rear of the car and ran across 14th Street to the northwest, and out of sight. Several other witnesses for the State, negro residents of the neighborhood, were aroused by the first shot. Some of them saw appellant standing near the car and saw him fire several shots into the car and then run across to the west side of 14th Street and disappear. One of these witnesses (Kate Hardy) said that, after appellant was arrested and brought back to the scene of the shooting, she heard appellant say to the officers: "Please don't hit me any more; I will tell you the truth; I thought it was a hold-up." This witness also said she saw the officers beat appellant. Officers Mergelkamp and Stowell heard the shots and returned to the car by different routes. They said the second shot made a louder report than the first shot and the volley of shots that followed the second shot. Mergelkamp found appellant attempting to hide behind a post in an alleyway west of 14th Street and north of Papin Street, about 125 feet from the car. He also found appellant's pistol (.32-.20) sticking in the ground behind a big stone. After he arrested appellant and while walking with him along the alleyway, he saw appellant throw five cartridges and a half-dollar coin into an open vault nearby. The cartridges and coin were recovered and produced at the trial. When questioned by Mergelkamp, appellant said he had run away from a negro crap game where there was some shooting. Mergelkamp admitted that he struck appellant with his pistol and cut his lip; this, he said, he did because appellant struck him. Two officers in uniform, who took charge of appellant after his arrest, did not testify. One of the witnesses for the State (Hamilton) said appellant's lower lip was split, the side of his face was bloody, and there was a "swollen spot" on the side of his head. Sears was found unconscious, probably dead, leaning backward in the back seat of the car with his head extending out of the left side of the car. He was pronounced dead at the City Hospital a few minutes later and six bullets were removed from his body. All of these bullets entered the front part of his body and one penetrated his heart. His revolver (a Special Colts .44) was found on the floor of the car and had in it one empty shell. A bullet hole was discovered in the lower edge of the top or canopy of the car on the right side and directly opposite to the position in which Sears was found in the car.

It further appeared from the State's evidence that appellant showed his pistol to one of his neighbors (Lee) a few days before the shooting, and Lee testified that appellant referred to it as a "sure 'nuff gun." This witness also said that he saw appellant during the early part of the night of the shooting and appellant "looked like he had been drinking a little;" and that "he seemed to be a little bit intoxicated." Appellant also showed his pistol to his brother-in-law (Gholston) about nine o'clock on the night of the shooting in appellant's home, where Gholston spent the night as a visitor. Gholston said appellant left the house about one o'clock. Appellant's step-daughter (Otho Belle Hunter), fourteen years old, testified that he took his pistol out from under his pillow and left home about twelve or one o'clock. When asked about his condition at that time, she said: "He wasn't very drunk." The State's evidence showed no previous acquaintance or difficulty between Lieutenant Sears and appellant.

Appellant took the stand and testified rather at length in his own behalf. He said he was a native of Mount Pleasant, Tennessee, but had lived in St. Louis fourteen years, and for the last four years at 1706a Gratiot Street, one block north and three blocks west of the corner where the shooting occurred. He admitted that the pistol found by officer Mergelkamp was his pistol and said he bought it a few weeks before in East St. Louis. He also admitted that he fired six shots with this pistol at the man in the car, but denied throwing the five cartridges and the half-dollar coin into the vault after his arrest in the alleyway. He said he left his home between twelve and one o'clock to take his pistol to the home of his brother (John Lashley), because his brother was going to Caruthersville, Missouri, to work, and his brother's wife wanted the pistol to protect herself; that he had promised his brother in the afternoon he would bring the pistol that night, but could not go earlier because he had company at his house; that his brother lived on Papin Street a short distance east of 14th Street, and that he was walking along the north side of Papin Street and was approaching 14th Street when he first noticed the car parked on the intersection of Papin and 14th Street; that he couldn't see anybody in the car, but thought there might be a man and woman in the car and that he "would bore around the car and try not to disturb them." As to what happened at this time, appellant further testified as follows:

"When I got to 14th I come within about eight, ten feet of that car. I heard a voice say, 'Come here!' Like that. Well, I turned with my face back to see who it was and where the voice come from. I seen a gun sticking out the car like that. I said, 'Are you calling me?' I turned to go, and he opened and fires a shot as I turns to go. I fired back as quick as I possibly could. I didn't know who it was; I thought some highway burglar, I didn't know who it was. He

never said anything to me but them words, he said them two words, 'Come here!' That's all he ever said.''

On cross-examination, he said that the car was parked ''directly north and south'' in the middle of the intersection; that he did not go up to the car, but was standing on the west side of the car and about ten feet from the car when he emptied his gun. When asked why he emptied his gun, he said: ''I didn't know who was shooting at me and I was trying to protect myself the best I could, and I was scared, I didn't know who was shooting at me.'' He further said he had his pistol in his hand, wrapped in a piece of newspaper, and when questioned as to how he removed the newspaper to shoot, he said: ''Oh, the piece of newspaper is thin enough for me to push a hole through with my finger. Put my hand in there easy. Why, I done the shooting. I shot as quick as he shot; I didn't know who it was.'' He further testified that he did not know Lieutenant Sears and had never seen him.

Lucy Higgins, who lived at 1402 Papin Street, was produced as a witness for appellant. She said she was sitting in her front window in the second house west of the intersection on the south side of Papin Street; that she saw the car parked and three or four officers get out and go west on the north side of Papin Street; that very soon thereafter she saw appellant coming from the east on the north side of Papin Street and heard him talking to the man in the car; that she couldn't understand what the man in the car said, but she heard appellant say, ''I am tending to my business; I ain't bothering anyone.'' When asked what happened then, she said: ''Then soon after a bullet went by Lashley's head, and then Lashley commenced shooting.''

''Q. Where was the first fire of the pistol from? A. It was from the automobile.

''Q. Yes. That was the first shot? A. Yes, sir.''

She further said that appellant was fifteen or twenty feet from the car when the shooting took place.

John Lashley (appellant's brother) testified that he talked to appellant in the barber shop during the afternoon before the shooting and asked him to let his (John Lashley's) wife have his pistol while he (John) was away from home; and that appellant said he would bring the pistol over to his (John's) house that night. The witness and also appellant's wife (Willie Lashley) were permitted to testify that appellant had never been arrested and had never been in any trouble before. Three other witnesses testified to appellant's previous good reputation.

This case was tried and the motion for a new trial filed before the enactment of the 1925 Statutes (Laws 1925, p. 198), and, therefore,

574

the present rule requiring assignments of error to be "set forth in detail and with particularity" does not apply. However, many of the errors assigned in the motion for new trial are not considered in appellant's brief and,. for that reason, will be treated as abandoned. [State v. Bishop, 296 S. W. 147.] No attack is made on the indictment and the sufficiency of the evidence is not challenged. Though other grounds for reversal are urged, the serious questions presented for our review relate to the trial court's instructions to the jury.

I. Counsel for appellant first contend that the evidence did not warrant an instruction on murder in the first degree, because there was an absence of proof tending to show any *deliberation* or *lying in wait*. After a very careful consideration of the evidence we are unable to agree with counsel in this contention. True, the proof fails to show that appellant had any grudge against Lieutenant Sears or that there had ever been any previous contact between them. But, two reputable, disinterested citizens (Church and Hamilton), in a position to plainly see what happened, solemnly testified that appellant left his free and unobstructed path of travel, and, with his right hand up close to his right side, walked over to the car, placed his left hand on the car immediately behind the front seat, and then, after a pause of a few seconds, raised his right hand and fired a shot into the car; that then, one shot was fired from the back seat of the car; and then, appellant fired a volley of shots into the car. All of the six bullets from appellant's pistol struck Sears in vital parts of his body. The car stood under a bright arc light. While there was nothing about the car to indicate that it was a police car and while Sears was dressed in plain clothes, his police badge or "shield" was pinned on the outside of his coat. Appellant, his wife, stepdaughter and brother-in-law, all testified that appellant left his home to go to his brother's house, a few blocks distant, between twelve and one o'clock. Where he was or what he was doing from that time until after two o'clock is unexplained, except by his own story to the officers, when arrested, that he had visited a negro crap game where there was some shooting and he ran away. Shortly before appellant was seen to approach the police car, a "cutting scrape" in the neighborhood was reported, and other residents of the neighborhood recognized that the car was a police car and that Mergelkamp and Stowell were officers in plain clothes. Under all of these circumstances a fair-minded jury might reasonably conclude that appellant, also, knew that this was a police car and that Sears was an officer of the law. Moreover, at the time appellant undertook to pass or approach the car, he was committing a felony in the presence of an officer by carrying a deadly weapon concealed about

his person, and he was subject to arrest for that offense. In the light of these plain, outstanding facts we feel fully justified in the conclusion that a case for the jury was made on first degree murder and that the trial court properly instructed the jury on that degree of homicide. [State v. Crump, 267 S. W. 822; State v. Moore, 235 S. W. 1056; State v. Cushenberry, 157 Mo. 168, 56 S. W. 737.]

II. It is next contended that the trial court committed error in failing to instruct the jury on second-degree murder. This contention must be sustained. Appellant testified that the man in the car called to him and said, "Come here," and pointed a gun out of the car; that he said nothing about being an officer or about arresting him, and that he (appellant) did not know the man in the car was an officer or who he was; that, as he (appellant) "turned to go," the man in the car fired a shot; that he thought the man in the car was "some highway burglar" and he (appellant) was "scared " when he commenced to shoot. Lucy Higgins, located in the front window of her home nearby, testified that she heard appellant and the man in the car talking and heard appellant say, "I am tending to my business, I ain't bothering anyone." Also, that "soon after a bullet went by Lashley's head and then Lashley commenced shooting." There was substantial evidence to the contrary, but a sharp issue of fact was thus presented, which made it necessary to instruct the jury on this phase of the case. The appellant was clearly entitled to the benefit of such an instruction. The trial court recognized this issue, in part, in giving Instruction 6, which, in effect, told the jury if they found that, at the time of the shooting, appellant did not know Sears was an officer and was not called upon by Sears to submit to arrest, then appellant was under no duty to obey the command of Sears; and if they found that Sears fired the first shot, appellant had the right to shoot Sears in self-defense, if appellant had good reason to believe and did believe that Sears was about to inflict upon him great personal injury. The testimony of appellant and of his supporting witness, Lucy Higgins, as to how the shooting occurred, not only tended to sustain appellant's plea of self-defense, but, when considered in connection with other facts and circumstances in the case, also invoked the general rule as to murder in the second degree. In the case of State v. Snow, 238 S. W. l. c. 1071, BLAIR, J., states the rule as follows:

"The general rule is that a presumption of murder in the second degree arises from an intentional killing of a human being by another where a deadly weapon is used by him at a vital part of the body, absent proof of other facts tending to show deliberation to raise such killing to first-degree murder or to show want of premeditation and malice to reduce the killing to manslaughter or to show

that such killing was excusable or justifiable."

The immediate facts and circumstances surrounding the shooting of the Sheriff of Audrain County in the case of State v. Crump, 267 S. W. 822, are very similar to the facts in this case, and that case and the authorities there cited fully support the conclusion above announced. See also, Secs. 3231, 4025, R. S. 1919; State v. Liolios, 285 Mo. 1, 225 S. W. 941; State v. Kyles, 247 Mo. 640, 153 S. W. 1047.

III. The further contention that the trial court should have instructed the jury on manslaughter is wholly without support in the record. The testimony of appellant that he thought Sears was "some highway burglar" and that he was "scared" when he was shooting at Sears presented a theory of intentional killing under a mistake or misapprehension, which made necessary an instruction on second degree murder, as above stated. But, it being established by all of the evidence, including that offered by appellant, that the killing was intentional, and there being no proof tending to show that the same was done in the heat of passion, there was no theory of manslaughter in the case and an instruction on manslaughter had no place in the case. [Sec. 3236, R. S. 1919; Separate opinion of BLAIR, J., State v. Crump, 267 S. W. l. c. 828.]

We have carefully considered appellant's other complaints as to instructions given to the jury, and as to the rulings of the trial court on the admission and exclusion of certain evidence, and as to other errors assigned, but we find no substantial merit in any of such complaints. Some of these complaints relate to matters which are not likely to occur on another trial of the case.

It is to be deeply regretted that a good citizen and a faithful officer should meet with such an untimely death, and in an affray of this character, and it is important that appellant, who admits this homicide, should be adequately punished, unless it is found that his act was justifiable. But, it is equally important that this appellant, like every other person accused of crime, should have a fair and impartial trial. A conviction otherwise obtained is no triumph for justice and does not tend to uphold the majesty of the law.

On the whole, the case was fairly tried, but the failure of the trial court to instruct the jury on murder in the second degree deprived the appellant of one of his substantial rights. For this reason the judgment must be reversed and the cause remanded for another trial. *Higbee* and *Davis, CC.,* concur.

PER CURIAM:—The foregoing opinion of HENWOOD, C., is adopted as the decision of the court. *White, P. J.,* concurs in the result; *Blair, J.,* concurs; *Walker, J.,* dissents, in a separate opinion.

WALKER, J., (dissenting).—The facts are correctly stated in the majority opinion. A repetition of the same is therefore unnecessary, except so far as concerns the burden of this dissent, which relates to the failure of the trial court to give an instruction for murder in the second degree, held in the majority opinion to have been error.

The appellant stated that in a peaceful manner he approached the car in which the officer was sitting when the latter called to him to "come here" and upon his failure to comply with the request the officer fired a shot at him, to which (in defense of his person) he responded with six deadly shots and then fled from the scene. A negro woman, Lucy Higgins, says she was sitting at her window diagonally across from the intersection of the streets where the shooting occurred, and that she heard the appellant say when he went to the car: "I am tending to my business. I ain't bothering anyone," whereupon there was a shot fired out of the car and several shots were fired by the appellant into the car. It is contended that such credence should have been given to this testimony as to require the trial court to give an instruction for murder in the second degree. I cannot concur in this opinion. Not alone because it is contradicted by three disinterested eye-witnesses of the crime, but because it is contrary to human experience and is testimony which may, in the utmost fairness, be held to be a *dernier ressort,* given by the accused in an effort to palliate his crime. Its attempted corroboration by the witness who states that she was sitting at her window at two o'clock in the morning and heard the remark of the appellant and saw that the first shot was fired from the car, is to my mind, unworthy of belief. The jury gave no credence to the testimony of the appellant nor that of Lucy Higgins; and it had a far better opportunity to test the truthfulness of this testimony than can be had by this court with no source of information other than the cold record. The trial judge did not believe it, although he, like the jurors, had every opportunity afforded by the personal presence of the witnesses and their manner of testifying to determine as to their veracity. That he did not believe it is attested by the fact that he did not give the instruction for murder in the second degree held in the majority opinion to have been the sole error authorizing a reversal. Where, as here, the testimony relied upon to require the giving of an instruction for a lower grade of homicide than that charged is unworthy of belief it should not be held to authorize a reversal. To so hold would, in effect, be to usurp the province of the jury concerning their right to weigh the evidence and to pass upon the credibility of the witnesses.

Before discussing the cases which hold that instructions for murder in the second degree are not authorized when based upon testimony

unworthy of belief, it is appropriate to refer to the recent cases which hold to the contrary. In State v. Kyles, 247 Mo. 640, it was held that there was no evidence of deliberation, and the testimony showing nothing more than an intentional killing, an instruction for murder in the second degree was authorized. This case can scarcely be held to sustain the ruling here under review.

In State v. Liolios, 285 Mo. 1, without reference to other relevant facts, the opinion holds that the defendant is entitled to an instruction for a lower grade of homicide than murder in the first-degree on his testimony alone on the ground that our function is limited "to writing the law as it is written." This case may be fairly held to be more of an obeisance to the god of precedent than a regard for the relevant facts.

In State v. Jordan, 306 Mo. 3, 268 S. W. 64, it was ruled that an instruction for murder in the second degree should have been given. While the opinion does not fully state the testimony, an examination of the same, as we read it, does not disclose such a state of facts based on the testimony of the defendant, as to authorize the giving of the instruction. This testimony was wholly inconsistent not only with the defendant's earlier statements but contrary to all of the other testimony.

In State v. Snow, 238 S. W. (Mo.) 1070, the defendant did not testify and the rulings in that case are not relevant to the question here under consideration. Nor are the rulings in the cases of State v. Minor, 193 Mo. 597, 92 S. W. 466, and State v. Young, 119 Mo. 495, 24 S. W. 1038, when examined in the light of the testimony in each.

In State v. Crump, 267 S. W. (Mo.) 822, the giving of the instruction for murder in the second degree was based upon the testimony of the defendant and others, an examination of which will disclose that it was not at a variance with acts of a similar character, nor contrary to physical facts, nor the conduct of persons under like circumstances as was that of the appellant in the case at bar. The Crump case therefore cannot reasonably be held to support the conclusion reached in this case.

In State v. Williams, 274 S. W. (Mo.) 50, it was held to have been error not to instruct on murder in the second degree under the following facts, as stated in the opinion, that: "the theory of the State was that the defendant was guilty of murder in the first degree because the homicide was committed by lying in wait. The defendant's testimony was that he had not been waiting at the corner of Fifteenth and Chestnut streets for the deceased, but had gone there to get his breakfast, and that the deceased, when they met, said to him, 'I guess you're ready this morning' and pulled out his knife and I fired and shot him, and he ran across the street and I fired again and it looked like he kept trying to get on me and I kept firing at him."

This testimony was held to require the giving of an instruction for murder in the second degree, despite the fact that a former voluntary statement of the defendant introduced in evidence, which was made immediately after the commission of the crime, was contradictory in every material particular to his testimony on the stand. The writer dissented from this ruling (274 S. W. 52) and cited and discussed many cases determined by this court holding to the contrary.

It may be conceded that a defendant is entitled, under the statute (Sec. 4025, R. S. 1919), to instructions upon any phase of the case supported by substantial evidence, and where the facts warrant it such instruction may be authorized by the testimony of the defendant alone. It was never contemplated, as we said recently in State v. Webb, 205 S. W. (Mo.) l. c. 187, either under the statute above cited or in any of the judicial interpretations of the same (State v. Douglas, 258 Mo. 291, 167 S. W. 552; State v. Weinberg, 245 Mo. 575, 150 S. W. 1069; State v. Starr, 244 Mo. l. c. 176, 148 S. W. 862; State v. Conway, 241 Mo. 271, 145 S. W. 441), that an instruction based upon the testimony of the defendant alone should be given, when the falsity of that testimony is apparent, in that it contradicts all the other testimony and is not in accord with the physical facts and human experience. This rule accords with reason, and is in furtherance of a wholesome administration of the criminal law. It has been upheld in many cases. In State v. Tucker, 232 Mo. l. c. 18, 133 S. W. 27, it is held that, where the statements of the defendant contradict the physical facts and are inconsistent with human experience, the court is not bound to believe them, nor to instruct thereon for a lower grade of homicide than that supported by all the other testimony. In State v. Arnold, 206 Mo. l. c. 600, 105 S. W. 641, it is held that neither courts nor juries are required to accept as true evidence contradictory of the admitted physical facts in the case. In State v. King, 203 Mo. l. c. 571, 102 S. W. 515, the defendant sought to have the court give an instruction for a lower grade of homicide, based on his own testimony. Its refusal by the trial court was sustained upon appeal, on the ground that neither courts nor juries are required to stultify themselves by rejecting the irrefutable facts in a case. In State v. Vaughan, 200 Mo. l. c. 22, 98 S. W. 2, it is held that courts are not required to yield credence to the statements of a defendant absolutely inconsistent with the physical facts, and base an instruction on such simulated evidence. In State v. Fraga, 199 Mo. l. c. 136, 97 S. W. 898, it is held that, where the facts are clearly inconsistent with the defendant's account of the homicide, he is not entitled to an instruction on the ground of self-defense. In State v. Gartrell, 171 Mo. l. c. 523, 71 S. W. 1045, it is held that neither courts nor juries are bound to accept testimony contrary to well-known physical laws or the common experience of

mankind, and hence an instruction asked by defendant, based on his testimony alone, was held not to be authorized. In State v. Pollard, 139 Mo. l. c. 228, 40 S. W. 949, it is held that neither courts nor juries are required to yield credence to the statements of a defendant, who, to save himself from justly merited punishment, challenges the array of all the physical facts in the case, and then boldly invokes instructions based on such simulated evidence. In Payne v. Railroad, 136 Mo. 583, 38 S. W. 308, the court holds that, even in criminal cases involving liberty or life, if a party testifies in opposition to obvious physical facts, neither courts nor juries are bound to give credence to such testimony. In State v. Nelson, 118 Mo. 124, 23 S. W. 1088, it is held that, while a defendant in a criminal case has a right to testify as to the intent with which he did the act, he is not entitled to an instruction upon his oral testimony, where it is contradicted by the physical facts.

To rule otherwise but tends to obstruct the administration of the criminal law and to add to the delays occasioned by reversals and to the opportunities, now too numerous, afforded criminals to escape punishment. No criminal case should be reversed unless it is evident that error has been committed prejudicial to the rights of the defendant. Such prejudice cannot arise by the refusal of an instruction which relies for its support upon testimony inconsistent with all of the other facts in the case and is contrary to reason and to human experience. Theorists may clamor and doctrinaires demand radical changes in our criminal laws as aids in lessening crime. Our statutes, both substantive and of procedure, are of such a nature as to not require modification to facilitate their effective enforcement. The remedy sought is not to be obtained through legislation. Prompt and vigorous prosecutions, a disregard of technical defenses, and convictions supported by substantial evidence will prove far more effective in lessening crime than any legislative panaceas. From the days of Bentham it has been declared without attempted refutation that the certainty and not the severity of punishment is the most effective deterrent of crime. That aphorism has lost none of its force in the years that have elapsed since its first declaration. If observed in the trial as well as the appellate courts it will not only effect a wholesome administration of the criminal law but tend to lessen crime. I am of the opinion, therefore that the judgment of the trial court should be affirmed.