# THE STATE v. JOHN WHITSETT, Appellant.

### Division Two, February 14, 1911.

1. **MURDER IN FIRST DEGREE: Instruction for Murder in Second Degree.** Although the evidence shows defendant to be guilty of murder in the first degree or not guilty at all, defendant cannot complain that the court gave instructions authorizing the jury to find him guilty of murder in the second degree.

2. **NEWLY-DISCOVERED EVIDENCE: Impeachment: Cumulative: Diligence.** A new trial, based on newly-discovered evidence, brought forward to impeach a witness for the State, who swore he had never been convicted of a crime, whereas in fact, as is shown by the affidavits, he had been convicted more than once and had served at least one term in the penitentiary for felony, ought to be denied; where the only purpose of the newly-discovered evidence is to impeach the witness, and the facts show that it is only cumulative, and that not only was no diligence shown to discover it before trial, but in fact it was then known.

3. **INDORSEMENT OF WITNESSES: Waiver.** Where the State calls a witness whose name is not indorsed on the information, defendant, when said witness is called, should move for a continuance on the ground of surprise; and if he fails to do that, he waives any right to complain by reason of surprise. But, in addition to that, in this case, the facts show that defendant knew for two terms that the witness would be called, and hence the purpose of the statute requiring the names of witnesses to be indorsed on the information, namely, to give the defendant an opportunity to come prepared to meet the State's evidence and to obviate surprise, was met without the indorsement.

4. **INSANE WITNESS: No Prior Examination.** Where defendant makes no objection to the witness's testifying on the ground that he is insane, nor requests the court to examine him on his *voir dire*, and the witness's answers are clear, coherent and consistent, it is not error to admit his testimony in evidence, nor error to refuse to strike it out after he has testified.

5. **EVIDENCE: Malice: Remoteness: Subsequent to Homicide.** Testimony that three months after the homicide defendant said he wished to sell deceased's brother a monument for deceased's grave; that about two years before the homicide defendant made threats against deceased; and that at the

funeral of another person some months after the homicide, defendant asked witness, "Where is that devil buried at in this graveyard?" is competent as tending to show malice on the part of defendant towards deceased, and its remoteness does not affect its admissibility.

6. **REMARKS OF COUNSEL: No Objection.** Where appellant fails to except to the failure of the court to rule upon his objection to remarks of the prosecuting attorney, at the time the objection was made, his objection is not open for review on appeal. All objections must be made at the time the remarks are made. A general objection made at the close of the argument is not sufficient.

7. **UNASSIGNED ERRORS.** Complaint that the court gave improper instructions and excluded proper and relevant testimony for the defense, without any specification thereof, cannot be considered. The appellate court will not hunt through the record for such errors.

Appeal from Ray Circuit Court.—*Hon. Francis H. Trimble*, Judge.

AFFIRMED.

*Jas. L. Farris, Jr.*, for appellant.

(1) The defendant is charged with murder in the first degree. The jury convicted him of murder in the second degree. The theory of the State, and the evidence in support thereof, was that the defendant, if guilty at all, was guilty of murder by lying in wait for his victim. And we also insist that if the defendant was guilty of killing Albert Albright he was guilty of murder in the first degree. The fact that the jury found the defendant guilty of murder in the second degree carries with it proof that the triers of the defendant did in fact have a reasonable doubt of the defendant's guilt or connection with the killing at all. Such being the case it was the duty of the jury to acquit on the ground of reasonable doubt alone. (2) The motion for a new trial should have prevailed upon the discovery and proof by affidavit that Henry W. Smith had been convicted and sen-

tenced for a felony in the State of Oklahoma, and sentenced to the Kansas penitentiary. He willfully and deliberately committed the crime of perjury in this trial. If the newly discovered testimony respecting his conviction had been known, and the evidence produced after he had sworn that he had never been convicted, then, upon the theory that if a witness has testified willfully or falsely to any material fact the jury are at liberty to disregard the whole or any part of such witness's testimony, this jury could have set his whole story aside as an infamous fabrication. State v. Moran, 216 Mo. 557; State v. Murray, 91 Mo. 103; State v. Bailey, 94 Mo. 315; 1 Wigmore on Ev., sec. 497.

*Elliott W. Major,* Attorney-General, and *John M. Atkinson,* Assistant Attorney-General, for the State.

(1) Since the enactment of Sec. 4903, R. S. 1909, in the year 1879 (Sec. 1654, R. S. 1879), it has been the well-settled law of this State that where the defendant, if guilty at all, is guilty of a higher grade of the offense than the one upon which he is convicted and upon which the court gave an instruction, he is in no position to complain of an instruction given upon such lower grade of crime, even if there was no evidence upon which to predicate such instruction. R. S. 1909, sec. 4903; State v. West, 202 Mo. 138; State v. Edwards, 203 Mo. 543; State v. Darling, 199 Mo. 202; State v. Todd, 194 Mo. 394. (2) The rule in respect to the granting of a new trial on the ground of newly discovered evidence is again stated by Judge GANTT in the late case of State v. Estes, 209 Mo. 306. To the same effect are the following authorities: State v. Church, 199 Mo. 639; State v. Speritus, 191 Mo. 41; State v. McKenzie, 177 Mo. 116. No diligence what-

ever is shown on the part of appellant and his counsel to investigate the former life of said Smith. The sole object of the newly discovered evidence is to impeach the character and credit of Smith, and for that reason no error was committed by the court in refusing to grant a new trial. No harm was done appellant by failure of the prosecuting attorney to have Smith's name indorsed on the information. Appellant had witnesses ready to impeach Smith. Furthermore, counsel for appellant should have moved the court for a continuance of this cause by reason of surprise when the State called said Smith as a witness, on the ground that Smith's name had not been indorsed on the information. Failure to do so amounts to a waiver of any right to complain by reason of surprise. State v. Wilson, 223 Mo. 187; State v. Bailey, 190 Mo. 278; State v. Myers, 198 Mo. 243; State v. Barrington, 198 Mo. 66; State v. Henderson, 186 Mo. 473; State v. Ray, 83 Mo. 268.

BURGESS, J.—At the October term, 1909, of the circuit court of Ray county, under an information charging him with murder in the first degree for the killing of Albert Albright, the defendant was convicted of murder in the second degree, and his punishment assessed by the jury at imprisonment in the penitentiary for thirty years. From the judgment of conviction defendant appeals to this court, and assigns error.

Albert Albright, the deceased, was a farmer and school teacher, living in the northwest part of Ray county. For some months prior to his death he had been teaching school at a place about four miles north of his home. On the 29th day of October, 1908, about four o'clock in the afternoon, he left his school, and, as was his custom, drove towards home in a buggy. About 6:30 that evening, he was traveling south along the public road, known as the "Slip-up" road, and

when about 210 feet northwest of the residence of William Keene he was shot from ambush, and his body was found on the public roadside, pierced by five bullet wounds. There was no witness to the tragedy, but neighbors heard the report of the shotgun at the time, as well as the noise of a team running away. A little north of where the body was discovered were found the hat and whip of the deceased, and a short distance further north were found gun-wads scattered in the public road. There were some trees and underbrush on the east side of the road, near the scene of the killing, and also on the east side near and opposite the point where the gun-wads were found was a shallow ravine containing considerable undergrowth and dead wood.

Whitsett and the deceased lived on adjoining farms, about a mile and a half distant from the home of William Keene, and had some serious difficulty over a boundary fence about two years prior to the tragedy. They had an encounter, one using a rock and the other a rifle, and Albright shot out one of Whitsett's eyes. A few months thereafter Albright was tried in the circuit court of Ray county upon the charge of assault with intent to kill Whitsett, and was acquitted on the grounds of self-defense. The ill-feeling engendered by the trouble and strife between the two men continued, the evidence shows, until the day of Albright's death, and the defendant made many threats against the deceased.

The defendant endeavored to prove an *alibi*. He did not testify at the trial, but he did testify at the preliminary hearing, and a part of his testimony given at that time was introduced by the State as admissions against him, and the defendant introduced the remainder of such testimony. According to this testimony, defendant left his home on the morning of the day the killing occurred, and went to the house of James Gulley, a neighbor, and got his shotgun, which he

loaned to Gulley some months before. He took his shotgun home, reaching there between two and three o'clock in the afternoon. He then left his home, with a pistol in his pocket, placed the shotgun in the smoke house and proceeded to the home of William Keene, where he was informed by Mrs. Keene that Mr. Keene and his grandson, Grafton Keene, had gone to Lawson. Defendant then went to the home of James Bassett, less than a quarter of a mile distant from the Keene home, and north thereof. Some time before sundown, the defendant, as he testified, parted with Mr. Bassett in a corn field, where Bassett was gathering corn and throwing it into a wagon. This corn field, as the evidence shows, lay between the Bassett and Keene homes, and the place where the men parted was less than an eighth of a mile from the scene of the killing. By actual experiment it was shown that the distance could be walked in five minutes. After parting with Mr. Bassett, the defendant proceeded south at an ordinary gait, to the southwest corner of the Keene house, where he turned east on the public highway, and had gone but a little distance in that direction when he heard the report of a shotgun. He turned back and went to the Keene house, where he stayed for about half an hour. While there, one Wick Bowen, a neighbor, came along and informed the people in the house that there was a man shot in the public road and that he thought he was dead. Whitsett did not go out with the others to see who the dead man was, but excused himself, saying that he could not see, and then left for his home. He further testified at the preliminary hearing that he did not know until the following morning who it was that was shot and killed, and then Grafton Keene was the person who gave him such information. On the way to the Keene residence that morning he saw and had some conversation with one John S. Carey. The defendant's family, according to his testimony, stayed at

the home of William Carey, a neighbor, the night of the tragedy.

The evidence on the part of the State showed that the deceased was wearing two overcoats at the time he was shot and killed, and that there were five bullet wounds in his body, the bullets entering the left side, and, according to the testimony of a physician, coming from a southeasterly direction.

Grafton Keene testified for the State that he was at the home of his grandfather, William Keene, on the evening of October 29, 1908. Between six and seven o'clock that evening, he heard the report of a shotgun, the sound coming from a northwesterly direction, and he then heard the noise made by a team running away. He went to the door and looked out, but saw no one. A few minutes later the defendant came to the door and knocked. He was admitted by the witness. The defendant was invited to eat supper there, and he did so. After supper, one Wick Bowen came to the house and called for Grafton Keene, and told him that there was a man lying in the road and that he thought he was dead. The witness told Whitsett what he had just heard, and asked him to go with him to investigate. Defendant replied, "I can't go; it's too dark; I can't see." Witness had a lamp ready at the time. The defendant, after prolonging his stay a few minutes, left for home. Keene and Bowen called on some neighbors to go with them to investigate, and when they found the body they recognized it as that of Albert Albright.

John S. Carey testified that as the defendant was going toward the Keene home, the morning after the shooting, he accosted him (witness) and said: "The man on the hill is dead." Upon being asked whom he meant, Whitsett replied, "Albert Albright." This testimony is very important by reason of the fact that defendant testified at the preliminary hearing that Grafton Keene was the first person to tell

him, next morning, the name of the person killed. At the time of the conversation with Carey defendant was on his way to the Keene house, where, as he testified, he learned that Albright was the man who was shot down the evening before. Defendant on his way back from Keene's had another conversation with the witness about the killing, and then said that Grafton Keene told him that Albright was shot in the neck. This witness also testified that he was a witness at the preliminary examination, held at Elmira, and that while there he was asked by the defendant to change his testimony so as to make it appear that the conversation between them as to the killing of Albright was had the second time they met, as the defendant was returning from Keene's house, and not before.

James Gulley, a neighbor of the defendant, testified that he was at the defendant's house the first Sunday after the preliminary examination referred to, and that defendant stated to him that he was standing northwest of Keene's house when Albert Albright came down the road in a trot, and slacked up as he got even with defendant's position; that defendant then remarked to the witness: "That was a pretty good shot, for a blind man to put five bullets through a man out of six."

Elijah W. Colley testified that before deceased was tried for assaulting Whitsett, the latter said to him that "he would wait till after the court decided, and if the court didn't he would act."

John Greenlee, a witness for the State, testified that some time after the first trouble between defendant and the deceased, the defendant remarked to him, "It's a long lane that has no turn; and I will get even with him some day."

John Burgess testified that about three years before the trial in this case he was at defendant's house, and that defendant asked him if he could "plan a way for him to get Albright to come over on Whitsett's

farm so he could kill him.'' The witness further tes-
tified that he was attending the funeral of a friend
who was interred in the same graveyard which con-
tained the remains of the deceased, and that defendant
there said to him, ''Where is that devil buried at in
this graveyard?''

Ed Bowen and Wick Bowen testified for the State
that as they were traveling on the road, near the scene
of the crime, the morning after the tragedy, they saw
defendant standing at the north side of the ravine
alluded to; that they stopped and told him that Al-
bright was dead; that the defendant said, ''Dead?''
and they replied, ''Yes, dead.''

Thorton Gorham, constable, testified that he ar-
rested the defendant and brought him before Justice
Crowley. This witness was asked to state what Whit-
sett said when asked whether he was guilty or not
guilty. Witness answered, ''He didn't make any an-
swer the first time he was asked, and the Judge asked
him again, and he said that they would have to prove
it on him; and the Judge told him that it would be
necessary to state whether he was guilty or not guilty,
but I hardly think he ever did answer the question
properly.'' Question: ''Did he ever say either that
he was not guilty?'' Answer: ''No, sir.''

Will McCowen testified that he had a conversa-
tion with the defendant on a train in February, 1909,
soon after this case was continued the first time. They
were returning from Richmond at the time. Whit-
sett asked McCowen if Monroe Albright, a brother of
the deceased, was on the train. McCowen asked him
what he wanted to see Monroe Albright about. Whit-
sett, after showing McCowen a pamphlet containing a
picture of a monument, said to him: ''I want to sell
Monroe a monument for his brother's grave.''

Frank Allen, who was a prisoner in the county
jail at the time defendant was incarcerated there,
testified that Mrs. Whitsett came to see the defendant

in the jail soon after his arrest, and that he overheard the conversation between them. Mrs. Whitsett, as the witness testified, informed the defendant that there was somebody around the house a night or two previously, and Whitsett asked her who it was. She told him she was afraid, and didn't go out to see. Whitsett asked, "Has anybody been there to see about those guns?" She answered, "No," and then he said, "Well, when you go back be sure as hell to take those loads out." He further said, "They'd better look out, for there is one fellow eating breakfast in hell now, and there will be some one else to help him."

James Bassett, who was the last person to see Whitsett before the tragedy, testified for the State that Whitsett and he parted in a corn field a short distance from the scene of the killing, and that when Whitsett left he went in the direction of the Keene house; that they parted before sundown, or about five o'clock. According to Bassett's testimony, he then gathered a load of corn, took it home, unloaded it in a crib, drove to the barn, unharnessed and watered his horses, turned them loose in the pasture, walked back to his house, washed his face, and then, as he was getting ready to eat supper, he heard the report of a shotgun in a southerly direction. Just prior to that he heard the noise made by a vehicle passing by his house.

Henry W. Smith, another witness for the State, testified to certain admissions and statements made by the defendant at his home on the night after his preliminary examination, as follows:

"Q. Were you at his home on the night after the preliminary hearing at Elmira? A. Yes, sir. Q. Did you stay there that night? A. Yes, sir. Q. Who else was there? A. Steve Mullins, Sherman Mullins, Charley Dalton and myself. Q. After supper where did you go, and—where were you after you had supper? A. Why, we were sitting around there,

and then went to bed.  Q.  In what room—sitting room?  A.  Well, I couldn't describe that, because I don't know whether you would call it a sitting room or not.  Q.  When you were talking were the ladies present?  A.  No, sir.  Q.  State to the jury what John Whitsett said relative to Albert Albright—the man who is charged with the killing?  A.  Well, he says, 'The son-of-a-bitch always wore two or three over-coats, so it takes a pretty good bullet to go through him.'  Q.  What else?  A.  Well, there was Steve and — Q.  State whether or not he said that he had the bullet to go through him?  A.  Why, he said, 'He got fooled, I got bullets to go through him.'  Q.  State what he said about the gun?  A.  Why, Steve had his gun there and Sherman, and they were drying them out at the stove, because it rained that night, and he brought his gun out.  Q.  Who?  A.  Whitsett.  Q. Go ahead.  A.  He brought the gun out, and says, 'Here's a gun—when I go after a man with it I get him.'  Steve says, 'I bet you do, too.'  Q.  What other statement did he make in the house that evening?  A. They were talking about the evidence given in the preliminary hearing there at Elmira.  Q.  What did John Whitsett say?  A.  They was talking about the bullets, and about—Steve mentioned that the 'woman' was swearing there about the bullets being 'made,' and Steve said he couldn't tell whether they were made or manufactured, and it seemed like a woman swore they were made; and Whitsett said, 'Why, the damned bitch didn't see me making it; she wasn't there.'  Q.  What statement did he make relative to firing the gun, and not being seen, if anything?    A. He said, 'I was slick enough so nobody seen me going or coming so they could swear to it.'  Q.  What did Steve say?  A.  Steve cautioned him to 'shut up.'  Q. In the course of these conversations what, if anything, did he say relative to shooting in the overcoat or neck? A.  Why, he said, 'There is no use shooting in the

overcoat as long as I can get him in the neck or head.' Q. What did Steve say? A. He says, 'That's right, too; whenever you do anything, why, do it right.'"

Further than his own testimony as given at the preliminary examination, the defendant introduced no evidence at the trial except such as tended to impeach and discredit the testimony of witnesses Smith and Allen, who testified for the State.

I. Defendant's first contention is that under the evidence he should either have been convicted of murder in the first degree or acquitted, and that the court erred in giving an instruction on murder in the second degree. This contention is rendered nugatory by section 4903, Revised Statutes 1909 (Sec. 2369, R. S. 1899), which provides that "any person found guilty of murder in the second degree, or of any degree of manslaughter, shall be punished according to the verdict of the jury, although the evidence in the case shows him to be guilty of a higher degree of homicide." Since the enactment of this section in 1879 (Sec. 1654, R. S. 1879), it has been uniformly ruled by this court that a person found guilty of murder in the second degree, under an indictment charging murder in the first degree, is in no position to complain of an instruction on the lower grade of the offense, although the evidence tended to show him to be guilty of the higher degree of murder. [State v. West, 202 Mo. 128; State v. Edwards, 203 Mo. 528; State v. Darling, 199 Mo. l. c. 202; State v. Todd, 194 Mo. l. c. 395.] Section 5115, Revised Statutes 1909 (Sec. 2535, R. S. 1899), provides that no judgment shall be arrested or in any manner affected because the evidence shows or tends to show the defendant "to be guilty of a higher degree of the offense than that of which he is convicted."

II. It is earnestly insisted by the defendant that the court erred in refusing to grant him a new trial

on the ground of newly discovered evidence that Henry
W. Smith, one of the State's witnesses, had been con-
victed of a felony in the Territory of Oklahoma, and
sentenced to the territorial penitentiary, at Lansing,
Kansas, and was also found guilty of violating an ordi-
nance of Kansas City, Missouri, and sent to the work-
house, although said Smith denied, on his cross-exami-
nation, that he had been convicted of any crime.

To entitle him to a new trial on the ground of
newly discovered evidence it devolved upon the de-
fendant to show: "First, that the evidence has come
to his knowledge since the trial; second, that it was not
owing to the want of due diligence that it did not
come sooner; third, that it is so material that it would
probably produce a different result if the new trial
were granted; fourth, that it is not cumulative only;
fifth, that the affidavit of the witness himself should
be produced, or its absence accounted for; and, sixth,
that the object of the testimony is not merely to im-
peach the character or credit of a witness." [State
v. Estes, 209 Mo. 288; State v. Church, 199 Mo. 605;
State v. Speritus, 191 Mo. 24; State v. McKenzie, 177
Mo. 699.] In support of his motion for new trial
on the ground stated, defendant filed various affidavits.

It is very apparent that the sole object of the
newly discovered evidence on which defendant bases
his motion is to impeach the character and credit of
witness Smith. Further, it would be cumulative, for
the testimony of said witness was impeached by Steve
Mullin, Charlie Dalton and Laura Whitsett, witnesses
for the defendant. One of the affidavits was made
and signed by Mrs. Rosa M. Mullin. In it she says that
Smith was arrested in Kansas City, Kansas, in 1905,
charged with stealing coal from railroad cars, that he
was convicted of said offense and that she was a wit-
ness at the trial of the case; that in a conversation
with Smith, about four years before the trial of this
case, she told him that she had heard that he was in

the Kansas penitentiary, and that Smith said to her, "I don't care if I have—I am as good as anybody." The record shows that Mrs. Mullin was subpoenaed as a witness for defendant on the 16th day of October, 1909, and it is shown by the affidavit of sheriff Sanders, preserved in the record, that Mrs. Mullin was present in the court room during the trial of the cause. Yet she was not called on to testify. While she states in her affidavit that she had not previously communicated to defendant's attorney the facts stated therein, the inference is inevitable that either the defendant or his attorneys had some knowledge of such facts. For what purpose was she subpoenaed if not to testify in behalf of the defense? Being in the court room during the trial, why was she not called on to testify? The record shows that several letters received by Mrs. Mullin from Smith were filed as exhibits in the case, but they are not preserved in the bill of exceptions. In support of his motion for a new trial the defendant filed several affidavits to the effect that Smith's character was bad, but the State filed about as many counter-affidavits of citizens of Kansas City, Kansas, stating that Smith's reputation for truth, veracity, morality, peace and quietude was good. The State also filed a counter-affidavit of one Lizzie Patterson, stating that the reputation of Mrs. Mullin for truth, veracity and morality was bad in Kansas City, where she lived for five years prior to her marriage to Sherman Mullin and moving to Ray county. Again, the evidence shows that the witness Smith lived with the families of Steve Mullin and Sherman Mullin, in Ray county, for about a year prior to the killing of Albright. He, together with other witnesses for the State, at the May term, 1909, of the Ray County Circuit Court, in the presence of defendant and his counsel, was recognized to appear at the following October term, as a witness for the State in this case. That the defendant was not ignorant of the nature of

Smith's testimony, before Smith was called on to testify, is quite evident from the fact that defendant had as his witnesses at the trial all of the parties mentioned by Smith in his testimony as being present at the time defendant, according to Smith's testimony, made the statements and admissions above set forth. No diligence whatever is shown on the part of the defendant and his counsel in the matter of investigating the former life of the witness Smith, and his convictions, if any, of offenses committed in this and other States. He denied, upon his cross-examination, that he had ever been convicted of crime, while the affidavits filed by defendant show that he had been convicted of two or three crimes, one of which was a felony. Had the defendant and his counsel been as diligent before the trial as they were after its termination, there is no reason to doubt that they could have discovered the facts as to Smith's career, and presented the same at the trial for the purpose of impeaching Smith and weakening the force of his testimony. The defendant is not within the rule applicable to new trials upon newly-discovered evidence. He has not shown that it was not owing to the want of due diligence that the evidence was not secured sooner. The newly-discovered evidence is cumulative, and simply goes to the impeachment of witness Smith. Therefore, we are of opinion that the court did not err in refusing to grant defendant a new trial on the ground stated.

III. It is further contended by defendant that a new trial should have been granted him because said Smith's name was not indorsed on the information. The affidavit of the prosecuting attorney shows that he did not know that Smith was to be a witness for the State at the time he filed the information, and that for that reason his name was not indorsed thereon. The only object of indorsing the name of a witness on an

indictment or information is to give the defendant an opportunity to come prepared to meet the evidence of such witness at the trial, and obviate surprise. Defendant knew full well, before the trial, that Smith was to be used as a witness for the State, for, as stated, he had subpoenaed every person present at the time Smith said defendant made the admissions testified to; and the sheriff makes affidavit that Smith was present at both the February and May terms of said court before the trial of this cause, at the following October term. Furthermore, counsel for defendant should have moved the court for a continuance on the ground of surprise, when the State called said Smith as a witness. Failure to do so amounts to a waiver of any right to complain by reason of surprise. [State v. Wilson, 223 Mo. l. c. 187; State v. Bailey, 190 Mo. l. c. 278; State v. Barrington, 198 Mo. l. c. 66; State v. Henderson, 186 Mo. 473; State v. Roy, 83 Mo. 268.]

IV. A further contention is that the court erred in admitting the testimony of John Burgess, a witness for the State, for the reason, as defendant states, that said witness was of unsound mind, and that the court also erred in refusing to permit defendant to prove, after the witness had testified, that he was a person of unsound mind.

Defendant made no objection to the testimony of this witness on the ground that he was of unsound mind, nor did he request the court to examine said witness on his *voir dire*. This witness was thoroughly cross-examined by defendant's counsel, and his answers were as clear and pointed as were the questions propounded. "Whether or not a witness is sane is a question going to his incompetency, and therefore is for the court and not for the jury. The usual mode of determining competency is by examination of witnesses, or a personal examination by the court, or by

counsel, or by all these methods.'' [30 Am. and Eng. Ency. Law (2 Ed.), pp. 934, 935.]

Wigmore on Evidence, vol. 1, sec. 496, says: ''The ways in which the insanity may appear are four: (1) The general behavior of the person, while in court and before taking the stand, may be such as to exhibit the derangement to the judge; (2) the person may be questioned on the *voir dire,* so that his condition appears at once; (3) other witnesses to the derangement, may be offered before the person's testimony is begun; (4) the examination or cross-examination may disclose clearly the incapacity, in which case the preceding part of the testimony may be struck out, or may disclose grounds of doubt, in which case a *voir dire* or other witnesses may be resorted to. The preliminary determination of capacity is for the judge, not the jury (ante, sec. 487, post, sec. 2550); and it is therefore an improper practice for the judge to leave the testimony provisionally to the jury, to be rejected by them if found ineligible to legal standards, the jury having nothing to do with preliminary questions of admissibility.''

The record discloses that witness Burgess had never been in an insane asylum, and it is not shown that his sanity had ever been inquired into in any legal manner whatever. His testimony is as clear, coherent and consistent as that of any other witness in the case. Defendant neither requested the court to examine the witness on his *voir dire* to discover his condition of mind, nor moved the court to exclude his testimony on the ground that he was of unsound mind. We think the assignment wholly without merit, and the point must be ruled against the defendant.

V. The next contention is that the court erred in permitting witness McCowan to testify that, some three months after the killing of deceased, defendant said in his presence that he wanted to sell Monroe Al-

bright, brother of the deceased, a monument for his brother's grave, and that the court further erred in admitting the testimony of witness Burgess as to threats made by defendant against the deceased about two years before the crime was committed, and also as to a remark, indicating malice towards the deceased, made by the defendant to said witness in the graveyard where, and some months after, the deceased was buried. The objection is that said threats and remarks were too remote to be admissible.

The evidence objected to was clearly admissible as tending to show malice on the part of the defendant against the deceased at the time the deceased was killed. The rule governing the admission of such testimony is thus stated by Wigmore: "Where an emotion of hostility at a specific time is to be shown, the existence in the same person of the same emotion at another time is in general plainly admissible. What that limit of time should be must depend largely on the circumstances of each case, and ought always to be left to the discretion of the trial court." [1 Wigmore on Evidence, sec. 396.] "Subsequent statements of the accused showing that his hatred of the deceased was so intense that it pursued him beyond the grave are admissible on the issue of express malice." [21 Cyc. 898.] In the case of State v. Bailey, 190 Mo. l. c. 284, Judge GANTT, speaking for the court, said: "The statement of the defendant on the same day of the homicide and subsequent thereto, in the presence of the witness Cooper, when one of the judges had stated that the hack-drivers could never expect to win a strike by shooting people, to the effect that, 'That was the only way to win, and they all ought to be killed,' was not improperly admitted; it was a voluntary statement of the defendant, and, taken in connection with the other facts already noted, tended to establish the motive and intent which actuated him at the time of the homicide."

On the question of remoteness it has often been held by this court that the competency of threats as evidence against the defendant and declarant is not affected by their nearness or remoteness, which only goes to the weight of the evidence. [State v. Wright, 141 Mo. 333; State v. Glahn, 97 Mo. 679; State v. Adams, 76 Mo. 357; State v. Grant, 79 Mo. 137; State v. McNally, 87 Mo. 650.]

VI. Defendant complains of the closing argument of the State's counsel as being "fiery, impetuous and denunciatory," and very prejudicial to defendant's rights. We have read said argument as set out in the record, and we think it undeserving of such characterization. In the course of his argument the prosecuting attorney said: "Men, will you to-day declare murder to be a crime in this county? You have the power to do it." To this defendant's counsel objected, and said, "We all admit murder is a crime anywhere in Missouri, and we object to the remark." No ruling was made by the court, and no exception was saved to the failure of the court to rule. At the close of the said argument we find the following: "To each and every statement so made the defendant, then and there and at the time, objected, as above shown." But we do not find that defendant made any objection save that above noted. Defendant having failed to except to the court's failure to rule, the point is not now open for review. [State v. Court, 225 Mo. l. c. 616.]

Other points were made by counsel for defendant in his oral argument and are repeated in his printed brief, and we have considered the same, but in our opinion, neither singly nor collectively, do they constitute reversible error.

While complaint is made that the court gave improper instructions, and excluded proper and relevant testimony for the defense, the errors, if any, are not

232 Sup.—34

specifically pointed out, nor do we find any. This court will not hunt through the record for such errors. [State v. Holden, 203 Mo. 581.]

The record in this case teems with evidence tending to show defendant's guilt. He attempted to prove an *alibi*, but wholly failed to do so. The evidence shows that between the time he parted with witness Bassett in the corn field and the time he entered the Keene home that evening an hour or more had transpired—ample time within which to commit the crime. The place where he parted from Bassett and the place in the road where he turned back to enter Keene's house were but a short distance apart, to travel which distance the defendant declared in his testimony at the preliminary examination would not take more than twenty minutes. Where he was and what he did during the remaining forty minutes of the hour he does not pretend to show. His peculiar conduct at the Keene home, after intelligence of the shooting was brought to him, in refusing to go with Grafton Keene and others to see who the dead man was; his communication to witness Carey, the morning after the killing, that Albert Albright was dead, and his efforts to persuade the witness to change the trend of his testimony at the preliminary examination; his threats against the deceased, made at various times before the commission of the crime, and his subsequent statements and remarks evidencing his hatred of the deceased—these and many other facts and circumstances in evidence are all very significant and indicative of guilt. Though the testimony of witness Smith, to which defendant so strenuously objects, were wholly eliminated, there was still ample evidence to convict. There was not an iota of evidence tending to connect any other person than the defendant with the crime.

Defendant had a fair trial, he was represented by able and ingenious counsel, and was accorded every right guaranteed him by our Constitution. Finding

no reversible error in the record, the judgment is affirmed.

PER CURIAM.—The foregoing opinion was prepared by Judge BURGESS prior to his death and as it expresses our views, we hereby adopt the same as the opinion of this court. *Gantt, P. J.,* and *Kennish, J.,* concur.