THE STATE v. ARTHUR CURTIS, Appellant.—23 S. W. (2d) 122.

Division Two, December 11, 1929.

*Taylor & Taylor* for appellant.

61

*Stratton Shartel*, Attorney-General, and *Don Purteet*, Assistant Attorney-General, for respondent.

DAVIS, C.—In an information filed by the prosecuting attorney in the Circuit Court of Livingston County, defendant was charged with robbery in the first degree with a dangerous and deadly weapon, to-wit, a pistol. The jury returned a verdict finding defendant guilty of robbery in the first degree as charged in the information, and assessed his punishment at fifteen years in the State penitentiary. An appeal was taken from the judgment entered on the verdict.

The evidence developed on the part of the State warrants the finding that one I. B. Owsley operated a grocery store in the city of Chillicothe, Livingston County. The store was sixty feet deep. On the night of November 15, 1927, about eight P. M., Owsley and one Charles Mann, a farmer, were present in the grocery store, sitting near the stove about the middle of the store, chatting and conversing. At this juncture two men came into the store and said, "Stick them up! Stick them up!" Owsley said that one of the men was defendant and he had a pistol. The men forced Owsley and Mann to lay flat on the floor, faces downward. They took from the cash register the sum of $32.97 belonging to Owsley. They also searched Owsley and Mann. The robber was dressed

on that occasion in blue overalls, a jumper or lumber jacket with a grayish cast, a light cap and freshly-shined light tan shoes. Defendant, when Owsley saw him in the police station the next day, was dressed in the same habiliments. On being asked the question, "And you are positive that he is the man?" meaning defendant, Owsley iterated, "Absolutely." Owsley said that he had a white handkerchief tied over his face, which covered it from below the nose down, that is, his mouth and chin. He stated that he could see his face sufficiently to identify him.

Charles Mann testified for the State. He said that defendant was the man who held the pistol and who covered them with it. Defendant had a white handkerchief under his nose and over his mouth, that hid the lower part of his face, and was dressed in blue overalls and a plaid lumber jacket of grayish hue. He wore light tan shoes freshly shined, and carried a bright new gun. When he saw defendant the next day in the police station, he identified him by the part of his face he could see, by his clothes and especially by his walk, for, when defendant left the store the night of the robbery, he saw him walk up the aisle to the front door. Mann said that his walk was the last thing that clinched the identification of defendant as the robber in his mind, as the clothes tallied and the features tallied, and then when he saw the gait he was thoroughly satisfied. He further said that the robber was a stoop-shouldered man, and that helped to identify defendant. Both Owsley and Mann positively identified defendant as one of the robbers that held them up that night.

The chief of police, for the State, testified that he saw defendant on the afternoon of November 15, 1927, and defendant was garbed in a lumber jacket, overalls and a light cap. During the day of November 16th, while defendant was in the police station, he was asked how he was dressed the evening previous, and he said, "Just the same as I am now." Defendant, so the chief said, on the sixteenth had on tan shoes, and defendant told him at that time that he had had them shined the evening before.

The proof on behalf of defendant tended to establish an alibi. There was much testimony that tended to contradict the testimony of Owsley and Mann relative to their identification of defendant as the man who committed the robbery. A portion of this testimony tended to show that Owsley said the next morning before defendant was apprehended, that he could not tell exactly what the men wore the night of the robbery. Other portions of the testimony tended to show that Owsley, even after he saw defendant in the police station, was uncertain as to his identity with the man who robbed him. Other portions of the testimony tend to contradict the evidence of the State with respect to the description of the clothing defendant wore, especially the statement that de-

fendant, while in the police station awaiting identification, had on tan shoes. It further tended to show that Owsley and Mann could have been mistaken as to the identification of defendant.

In rebuttal, the evidence for the State tended to show that defendant's general reputation for morality was bad. Other facts, pertaining to the issues raised, will be adverted to in the opinion.

I. It is said that the motion to quash the information should  have been sustained, on the ground that Section 3310, page 174, Laws 1927, was unconstitutional, because the enactment of said section violated Section 28, Article IV, of the Missouri Constitution, which provides that "no bill . . . . shall contain more than one subject, which shall be clearly expressed in its title."

Section 3307, Revised Statutes 1919, defines first degree robbery as feloniously taking the property of another from his person, or in his presence, and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person. Section 3310, Revised Statutes 1919, prescribed the punishment for first degree robbery at imprisonment in the penitentiary for not less than five years. It also prescribed the punishment for second and third degree robbery. In 1927, the General Assembly repealed Section 3310 as it then existed and enacted a new section (Laws 1927, p. 174), designated as Section 3310, which reads:

"Every person convicted of robbery in the first degree by means of a dangerous and deadly weapon shall suffer death, or be punished by imprisonment in the penitentiary for not less than ten years, and every person convicted of robbery in the first degree by any other means shall be punished by imprisonment in the penitentiary for not less than five years; every person convicted of robbery in the second degree shall be punished by imprisonment in the penitentiary not exceeding five nor less than three years; every person convicted of robbery in the third degree shall be punished by imprisonment in the penitentiary not exceeding five years."

The title to Section 3310, page 174, Laws 1927, reads:

"An act to repeal Section 3310, Chapter 24, Article 5, of the Revised Statutes of the State of Missouri of 1919, in relation to punishment for robbery, and enacting in lieu thereof a new section to be known as Section 3310, relating to the same subject."

A reading of Section 3307 advises that it defines robbery in the first degree. This degree of robbery may result from either violence to the person or the putting in fear of some immediate injury to the person. Robbery in the first degree may be per-

petrated by the use of a deadly and dangerous weapon, and it is none the less robbery in that degree under Section 3307 that such weapon was used. Consequently the use of such weapon in the perpetration˙of a robbery is included within the meaning and scope of the crime denounced by Section 3307. In other words, one may, by the use of a dangerous and deadly weapon, provided the other elements are present, commit robbery in the first degree.

It is evident from a reading thereof that the title to new Section 3310 (Laws 1927, p. 174) relates to punishment for robbery. The title to the act advises that the act relates to and provides punishment for robbery. The act itself does not go beyond this, for it does nothing more than prescribe punishment for robbery. The title and subject are germane, each one to the other. The bill or statute contains only one subject, that of punishment for robbery, and it is clearly expressed in the title. Robbery in the first degree, if the other elements are present, comprehends an act committed with or without a dangerous and deadly weapon, as the facts develop; and that a greater punishment is prescribed for robbery in the first degree with a dangerous and deadly weapon than without the use of such, does not affect the relation of the title and the subject to each other, for both the title and subject relate to one concept, that of punishment for robbery. The new Section 3310 does not make that a crime which was not a crime before. Both before and after the passage of new Section 3310, it was robbery in the first degree to feloniously take the property of another from his person, or in his presence, and against his will, by violence to his person, or by putting him in fear of some immediate injury to his person, by the use of a dangerous and deadly weapon. While the punishment prescribed in the act for the use of a dangerous and deadly weapon in the perpetration of first degree robbery is more severe and greater than a robbery committed without its use, yet the subject was single, that of punishment for robbery, and it was clearly expressed in the title. The power of the General Assembly to prescribe different punishments for first degree robbery, depending upon the gravity of the offensive act, is plenary. This ruling also disposes of the objection to the introduction of evidence.

II. (a) The complaint is made that the court erred in refusing to permit the defense to show that, on the evening previous to the robbery, defendant's face was in bad condition, as the result of a boil or abscess. Testimony that he bought a bottle of liniment at a store on that evening went in without objection. While the evidence was probably admissible for what it was worth, in corroboration of testimony that he did

not commit the robbery and to refute the testimony of the State's witnesses relative to identification, yet the complaint is not tenable in this court because of the absence of an offer of proof. [State v. Farrar, 285 S. W. 1000.]

(b) It is also charged that error obtained in refusing to permit defendant to show the condition of defendant's face while incarcerated in the jail. The only offer of proof made was that made with respect to the condition of defendant's face on the evening of November 16th, the day succeeding the robbery. The offer involved an examination of defendant made by the county physician on that day. As inflammation, caused by boils or abscesses, progresses in an interval of time, the evidence was inadmissible to show the condition of the face approximately a day after the alleged robbery, in that it was not shown that defendant's chin, at the time of the examination, was in the same relative condition that it was at the time the robbery was perpetrated.

(c) The State's witnesses testified in their identification of defendant that, on the night of the robbery, he wore tan shoes and that, when they observed him the next day at the jail, he wore tan shoes. Defendant's testimony shows that on the day of the robbery he wore black shoes, and it may be inferred from his testimony that he did not at that time possess tan shoes. Defendant offered to show by a shoe dealer that, in September or October previous, he bought a pair of low black shoes from him and had another pair repaired, and that the shoes defendant wore at the trial were the same shoes sold him by the dealer. The fact that defendant had previously bought or owned black shoes, or that he owned them on the day of the robbery, would not have tended to show that the perpetrator of the robbery did not wear tan shoes. Moreover, the only relative and material question related to whether defendant wore tan shoes on the night of the robbery, not whether he ever wore such shoes.

(d) Defendant, on the cross-examination of a witness for the State, elicited the fact that defendant wore tan shoes when the witness first confined him in jail. The trial court sustained an objection to the question, "Well, now, what kind of shoes has he been wearing, did he wear all through the time he was in jail?" The inquiry involved a period too remote from the time of robbery to be pertinent. Additional facts were necessary to render this line of inquiry corroborative of the testimony that defendant wore black shoes on the night of the robbery, resulting that the facts and circumstances involved did not justify the inquiry.

(e) Defendant was asked how far it was from John Owens's store to the Owsley store. He answered that he judged it to be a distance of ten or twelve blocks, but that he did not know because he had not seen Owsley's store that he knew of. It is evident that defendant had no knowledge of the distance, and that his testimony as to the distance was a mere guess. The court did not err in striking out the answer and instructing the jury to disregard it.

III. (a) In the cross-examination of defendant's witness, the prosecuting attorney asked if she was not a kind of a sweetheart of John Owens. The defendant objected, and the prosecuting attorney withdrew the question. He then asked the witness if she did not run around with the Curtises and that outfit. On objection, the court struck out the words "that outfit." The witness answered "No." As it resulted, the question was not only harmless, but defendant failed to save. an exception or to ask additional relief.

(b) Defendant complains of certain remarks made by the court during the trial, relative to conflicting statements and to the statement that Owsley was positive in his identification; and to the remark, speaking of defendant while confined in jail, "and no doubt he did have a change of clothing." We need not determine the prejudicial force of the above remarks, if any, for defendant failed to object and except to them.

IV. An assignment of error reads: "The alibi of defendant was proven by five unimpeached witnesses in addition to the defendant." It is possible that we do not understand the design of this assignment. However, if defendant means to submit that substantive evidence on the part of the State of the commission of a crime and defendant's connection therewith can be destroyed by evidence, however cogent, introduced by defendant tending to show that defendant had no connection with the perpetration of the crime, the position is untenable, for substantial evidence of the commission of a crime and the defendant's connection therewith raises an issue of fact for the jury, thus precluding us from interfering with its finding. We are unable to conceive of any further or different interpretation of the assignment of error than we have given .it.

V. An assignment charges the trial court with error in refusing to give to the jury Instructions Three, Four and Five asked by defendant. Instruction Three involved the presumption of innocence and the hypothesis that clear and convincing proof must be submitted before the jury

were authorized to convict defendant. Instruction Four placed the burden of proof on the State to show defendant's guilt beyond a reasonable doubt. Instruction Five involved an alibi. While these instructions properly declared the law as applied to the facts, it was not error to refuse them, because other instructions covered the field.

VI. Defendant requests, in his motion, a new trial on the ground that since the trial newly-discovered evidence came to his knowledge, and that his failure to discover it was not due to the want of due diligence on his part. The motion for a new trial was supported by the affidavits of witnesses, three of which affidavits were either cumulative of the testimony introduced on the trial, or tended to impeach a State's witness. The other two affidavits related to conversations of certain persons with other men, whom it was stated were later sentenced and confined in the penitentiary, to the effect that they robbed Owsley. Neither by his motion for a new trial, nor by an extraneous affidavit, did defendant make oath that he used diligence and that since the trial the newly-discovered evidence came to his knowledge. He may have known of this evidence prior to the trial, and his sworn statement was necessary to refute the inference that it was. Moreover, the affidavits of those who deponed that they heard the men later confined in the penitentiary say that they committed the robbery was nothing more than hearsay, and their statements could not have been admitted in evidence. Only the testimony of the men confined in the penitentiary would have availed defendant on a retrial, and no affidavit from any of them was filed. The request for a new trial, on the ground of newly-discovered evidence, fails to meet the necessary requirements in that regard. [State v. Miller, 144 Mo. 26, 45 S. W. 1104; State v. Whitsett, 232 Mo. 511, 134 S. W. 555.]

VII. Defendant assigns other alleged errors in his motion for a new trial, but fails to urge them here. However, we have examined such assignments of error, and find them untenable.

We have also examined the remaining portions of the record proper, and it is free from error.

It follows that the judgment must be affirmed. It is so ordered. *Henwood* and *Cooley*, CC., concur.

PER CURIAM:—The foregoing opinion by Davis, C., is adopted as the opinion of the court. All of the judges concur.