THE STATE v. KENNETH MASON, Appellant.—98 S. W. (2d) 574.

Division Two, November 17, 1936.

G. Derk Green and John D. Taylor for appellant.

Roy McKittrick, Attorney General, and James L. HornBostel, Assistant Attorney General, for respondent.

ELLISON, J.—The appellant was convicted of second degree murder in the Circuit Court of Chariton County on a charge of shooting and killing his paramour, Maxine Miller, on December 13, 1934. The jury assessed his punishment at ten years' imprisonment in the penitentiary. His motion for new trial below contained nine assignments of error. In his brief on this appeal six of these are expressly abandoned and the cause is submitted on the sole question whether the evidence was sufficient to support the verdict. We reserve our statement of the facts until we come to a discussion of that question, and shall consider first the effect of appellant's withdrawal of the foregoing six assignments of error in his motion for new trial. Five of them were addressed to the alleged erroneous admission and exclusion of evidence, and one to the giving of an instruction—all matters of exception. The question is, are we required by the statute, Section 3760, Revised Statutes 1929 (Mo. Stat. Ann., p. 3298), to pass upon these assignments, notwithstanding appellant's abandonment of them in his brief here?

I. This section has been in our statutes in almost identically its present form ever since the adoption of our first criminal code, Revised Statutes 1835, section 11, page 499. It reads as follows:

"No assignment of error, or joinder in error, shall be necessary upon any appeal or writ of error, in a criminal case, issued or taken pursuant to the foregoing provisions of this article; but the court shall proceed upon the return thereof without delay, and render judgment upon the record before them."

To strip the case of collateral questions let us start with the concession that it is our duty to search the record proper for error, regardless of whether any such questions are raised on the appeal, or were raised in the motion for new trial—or at all—below. [State v. Meadows, 331 Mo. 533, 534, 55 S. W. (2d) 959; State v. Marshall, 36 Mo. 400, 403; Hamuel v. State, 5 Mo. 260, 265.] Also let it be accepted as settled that where matters of exception were properly preserved below in a motion for new trial and are brought here in a bill of exceptions, this court will look to all the assignments of error in the motion for new trial if the cause is not briefed by the appellant. [State v. Maggard, 250 Mo. 335, 340, 157 S. W. 354, 356; State v. Reifsteck, 317 Mo. 268, 271, 295 S. W. 741, 742.] But when the appellant files a brief here in which he abandons assignments of error made below, by force of our rules or by implication or express withdrawal, what is the result? The decisions on the question are by no means uniform.

Rule 19 of this court, adopted in 1898 (see 143 Mo.), requires attorneys for appellants in criminal cases at least thirty days before the day of hearing to file in this court and to serve upon the Attorney General a printed statement containing apt reference to the pages

of the transcript, with an assignment of errors and brief of points and an argument. In State v. Barker, 294 Mo. 303, 315, 242 S. W. 405, 409, the rule was quoted and the case holds that because of the violation thereof we could "refuse to consider any of the questions discussed in appellant's brief." On the other hand, in State v. McBrien, 265 Mo. 594, 603, 178 S. W. 489, 491, the opinion treated Rule 15 (which makes certain requirements relative to the contents and arrangement of briefs) as applying to criminal cases; but held that notwithstanding appellant's violation of the rule he was in no worse shape than if he had filed no brief at all; and that in obedience to the statute, Section 3760, supra, the court would read the transcript in search of prejudicial error.

It has been held in several cases that where the errors complained of have not been specifically pointed out in the brief we will not hunt through the record for such errors. [State v. Whitsett, 232 Mo. 511, 530, 134 S. W. 555, 561; State v. Stenzel (Mo. Div. 2), 220 S. W. 882, 884; State v. Yates (Mo. Div. 2), 252 S. W. 641, 644; State v. Judge, 315 Mo. 156, 163, 285 S. W. 718, 721; State v. Preslar, 316 Mo. 144, 149, 290 S. W. 142, 144.] In this Presslar case WALKER, J., concurred in the result and WHITE, J., dissented on this point.

In State v. Flowers and Jones, 311 Mo. 510, 519, 278 S. W. 1040, 1043, several assignments of error were made but only one of these was stressed in the brief. The court said it was authorized to conclude the others have been waived. There are a number of cases applying this rule to assignments in the motion for new trial which are left out of the brief on appeal: State v. Kelley (Mo. Div. 2), 284 S. W. 801, 803; State v. Murrell (Mo. Div. 2), 289 S. W. 859, 860; State v. Simpson, 317 Mo. 398, 295 S. W. 739; State v. Sharp (Mo. Div. 2), 300 S. W. 501, 504; State v. Tally (Mo. Div. 2), 300 S. W. 722, 723; State v. Janes, 318 Mo. 525, 530, 1 S. W. (2d) 137, 139; State v. Frederick, 318 Mo. 548, 552, 300 S. W. 678, 680; State v. Lashley, 318 Mo. 568, 574, 300 S. W. 732, 734; State v. Lambert, 318 Mo. 705, 708, 300 S. W. 707, 708.

But in several recent decisions this court has refused to follow the cases cited in the last paragraph. In State v. Peters (Mo. Div. 2), 6 S. W. (2d) 838, the State contended that the appellant had abandoned all the assignments in his motion for new trial because none of them was presented in his brief. The opinion said "some authorities are cited which lend countenance to that position;" but nevertheless held that in view of Section 3760 the court must examine the record and review any points properly saved in the motion for new trial. In State v. Headley (Mo. Div. 2), 18 S. W. (2d) 37, 40, some of the assignments of error in the motion for new trial were omitted from the brief but the court declared "notwithstanding the omission, it is our duty to consider them, for they are not waived."

There was a similar holding in State v. Barr, 326 Mo. 1095, 1099, 34 S. W. (2d) 477, 478.

There are two other cases which especially call for consideration. In State v. Davis, 321 Mo. 598, 601, 12 S. W. (2d) 426, 427, appellant's counsel stated in argument that he waived every assignment in the motion for new trial except two, but this court said: "Regardless of such purported waiver, it is our duty, under Section 4106, Revised Statutes 1919 (now 3760), to examine the record for ourselves and render such judgment thereon as is required."

And the question was considered at some length in State v. Hannebrink, 329 Mo. 254, 260, 44 S. W. (2d) 142, 143. There, many of the assignments in the motion for new trial were not carried forward into appellant's brief, and the Attorney General contended these omitted assignments should be treated as abandoned. The opinion sets out Section 3760 and says: "We are not at liberty to ignore the plain mandate of that statute. If no errors are assigned in this court we must consider the record for errors properly preserved. How, then, can we say that if some errors apparent and excepted to in the record are not assigned in this court we have the liberty to refuse to consider them? If an appellant is so unfortunate as to be represented by counsel who either through incompetence or carelessness fails to present in his assignments of error here some matter vital to a determination of the case which was acted upon erroneously by the trial court, we are not at liberty to follow his misleading neglect."

The opinion in this Hannebrink case conceded "several" decisions of this court had reached a contrary conclusion, but said they had been overruled by State v. Peters, and State v. Davis, supra; and declared that none of these previous decisions had refused to consider a *reversible* error properly preserved at the trial merely because it had not been assigned in the brief here. Concluding, the case says Section 3760 does not mean it is necessary for an opinion in a criminal cause to *treat* all the assignments of error in the motion for new trial, but only requires that they be *examined;* and that if they are found to be frivolous "they may be dismissed from further consideration with that statement."

The writer hereof concurred in the Hannebrink case, but further consideration of the matter constrains us to hold the decision, and others like it, go too far. The substance of Section 3760 is that "no assignment of error, or joinder in error, shall be necessary upon any appeal or writ of error, in a criminal case; . . . but the court shall proceed . . . without delay, and render judgment upon the record before them." Without doubt that means appellate courts must render judgment upon the record before them though no assignments of error are presented; but a fair and practical construction of the statute does not permit of an interpretation that it deprives

the appellant of the right to appear in this court and withdraw assignments of error made below involving matters of exception.

Bills of exceptions in criminal cases were not allowed before the enactment of Revised Statutes 1835, section 23, page 491, in the same criminal code in which Section 3670 first appeared. Prior to that time matters of exception were not open to appellate review at all. [State v. Dimmick, 331 Mo. 240, 244, 53 S. W. (2d) 262, 264.] The making and saving of exceptions at the trial is optional with the defendant and his counsel. After an adverse verdict he may assemble and preserve such of them as he elects in his motion for new trial. Those that he leaves out of the motion are abandoned. Furthermore, even after that Sections 3756 and 3757, Revised Statutes 1929 (Mo. Stat. Ann., pp. 3292, 3295), expressly authorize the defendant or his attorney and the State's attorney, in the making up of the record for an appeal, to agree upon an abbreviated or *partial* transcript of the evidence and oral proceedings as sufficiently presenting to the appellate court *the issues involved on such appeal.* [State v. Shepard, 334 Mo. 423, 427, 67 S. W.. (2d) 91, 93.] It is clear from this that the issues on the appeal may be narrowed. If the defendant may waive matters of exception at and after the trial below we see no reason why he cannot do it here. When Section 3760 says the appellate courts must render judgment ''upon the record before them'' it must mean upon the record *submitted* to them.

The Hannebrink case argues that if the attorneys for an appellant were allowed to abandon assignments of error in this court he would be made the victim of his counsel's incompetence or carelessness when the latter failed to assign here some reversible error committed below and preserved in the motion for new trial. But aside from the fact that the negligence or want of skill of counsel affords no ground for the reversal of even a criminal case (State v. Dreher, 137 Mo. 11, 23, 38 S. W. 567, 569; State v. Selvaggi, 319 Mo. 40, 45, 2 S. W. (2d) 765, 767), the further fact is that the appellant is far more the victim of the incompetence, inadvertence and neglect of his counsel in the hurry and stress of proceedings in the lower court than he is in the appellate courts where his attorneys are not compelled to act until after they have had ample opportunity for investigation and deliberation. And yet in every volume of our reports will be found scores of cases in which this court refused to consider assignments of error made by the appellant because his attorneys had not stated them in the motion for new trial with that degree of definiteness required by the new trial statute. [Sec. 3735, R. S. 1929, Mo. Stat. Ann., p. 3275.]

Neither is the argument persuasive that this court need only *examine* assignments of error made below but abandoned here, without discussing them in the opinion if they are frivolous. If Section

1068, Revised Statutes 1929 (Mo. Stat. Ann., p. 1368), requiring the opinions of our appellate courts to contain a sufficient statement of the case, so that it may be understood without reference to the record and proceedings in the same, is constitutional and applies to criminal cases, we must discuss whatever assignments of error appear in the record, whether they are raised here or not—if we must pass on them at all. At least we are free to treat all assignments before us in the same manner, whether made here or made below but not presented here.

The substance of the whole matter is that it is not in accord with reason or sound policy to say this court cannot take advantage of the research of appellant's counsel resulting in a voluntary narrowing of the issues. It would be an obstruction to the orderly functioning of our appellate courts if the rule were that they *must* consider or treat in their opinions, or both, assignments of error which the appellant, himself, concedes are without substantial merit. In so holding we refer only to cases where assignments of error have been expressly withdrawn, or have been eliminated by implication because they are left out of the appellant's brief. We do not extend this ruling to cases where there is merely a faulty brief, such as those cited in a preceding paragraph beginning with *State v. Whitsett, 232 Mo. 511, 134 S. W. 555.*

II. On the question whether the evidence was sufficient to support the verdict. The appellant worked in a shoe factory at Brookfield, is married and has one child. Maxine Miller, the deceased, was nineteen years old, and married but not living with her husband. She and the appellant had sustained illicit sexual relations, he admitted, for about a month. On the night of December 12, 1934, he was with Mrs. Miller at a home in Brookfield when his wife came with two policemen. The wife, Mrs. Mason, remonstrated with the appellant about his relations with Mrs. Miller and his neglect of his family, and threatened to leave him. He told his wife he was through with her and expressed doubt about the paternity of his child. He gave her the keys to his automobile and she left. At no time on this occasion did the appellant say or do anything indicating any ill will toward the deceased, who was present but said very little.

The next morning the appellant sent word to the shoe factory that he was sick and could not report for work. Later in the morning he purchased some .32 caliber Remington automatic shells at a hardware store in Brookfield. That afternoon he called for Mrs. Miller at her home and from there drove her in his automobile, a Plymouth coupe, to a point in the country about seven miles southwest of Brookfield. Once on this trip about a mile from the scene of the homicide he inquired of a resident of the neighborhood, witness Green, whether the road was passable further west. A little further on witness Tolen

in his automobile overtook them. The appellant's car was stopped on the side of the road but without enough room for clearance. Tolen sounded his horn and appellant pulled further to one side and let him pass. Neither of these witnesses saw anything in the conduct of appellant and Mrs. Miller to attract especial attention. However, in about fifteen minutes Mr. Tolen noticed the same car drive past his home, which was about a quarter of a mile further west, at a pretty good gait considering that the road was covered with some drifted snow, and he saw only one person in the car. This was about three-fifteen P. M.

An hour later Messrs. Cameron, Stephenson and Keller, who had been repairing a telephone line in that vicinity, came along the road and discovered the body of Mrs. Miller in the snow and mud just about where Tolen had overtaken them. The corpse lay parallel with and about a foot or so north of the beaten path of travel, with head to the east, face down, right arm extended and left arm doubled under. The back of the head and the snow around it were bloody. The clothing was disarranged with the skirt pulled up over the back.

Dr. F. L. Harms, coroner of Chariton County, was called to the scene and examined the corpse, and later performed an autopsy. One .32 caliber bullet had passed through the head of the deceased, entering the skull two and one-half or three inches (another doctor estimated one and one-half to two inches) behind and about level with the top of the left ear, and emerging an inch behind and one-half inch above the external canthus of the right eye, this being the angle made by the junction of the upper and lower lids. There was a small powder burn of a width of about an eighth to a sixteenth inch clear around the edge of the entrance wound, a little wider on one side than on the other. Examination showed the uterus was non-pregnant. Sheriff Brown and Deputy Sheriff Myers testified there was a bruise on the right side of the throat of the corpse about as wide as a man's finger and about an inch long. Myers said it might have been a birth mark. Mrs. Miller was about five feet six inches tall and weighed about 150 pounds, and was right handed.

That night about eleven o'clock the appellant with his brother came to the city hall in Marceline, which is about ten miles from Brookfield and seventeen miles from the scene of the homicide, and turned over to Charles Rusher, the night watchman, an automatic pistol which it was conceded at the trial was the weapon that killed the deceased. The brother lived in Marceline and was remotely related by marriage to Rusher. The cartridges in the pistol were .32 caliber Remingtons, such as the appellant had bought that morning. There was testimony that the pistol would not fire until a safety catch on the side was released; that this catch ordinarily would be released by the thumb of a person holding the pistol in the right hand in normal firing posi-

tion; and that it would be difficult (though possible) to release the catch if the weapon were held in the left hand. It was also shown the deceased was not familiar with such firearms.

On examination of appellant's automobile blood was found on the right side of the back and seat cushions, also on the inside of the right door and on the floor. The window glass of the right door of the car it seems had some kind of a hole in it—at least the prosecutor so declared in his opening statement to the jury. The glass was exhibited to the jury but the testimony does not describe the break in the glass—if any—though it was shown to have been unbroken when witness Green talked to the appellant on the highway in the afternoon. It was admitted by appellant, however, that the car door unlatched in front and swung back so that it stood out at right angles to the car when fully opened. It was the State's contention that the shot which killed deceased must have been fired before the door was opened, because the glass would not have broken if it had stood straight out edgeways to the car.

Night Watchman Rusher called the sheriff, after appellant surrendered himself, as above narrated, and he was arrested that night and placed in jail. He made statements to the officers in which he said he and Mrs. Miller had been sexually intimate since about two weeks before Thanksgiving; and on the afternoon of the homicide they drove out into the country as heretofore described, and had been drinking. Mrs. Miller told him she was pregnant, and charged him with responsibility for it, and wanted him to go away with her. He replied he could not because he had a wife and child. Then she said she would end it all, and grabbed the pistol from a pocket in the car on the right side underneath the dash and opened the car door. She held the pistol in both hands and was trying to get out. He placed both arms around her about halfway between the shoulders and the elbows. In the scuffle the gun was discharged and she fell out of the car dead. He immediately left and went to his brother's home in Marceline and thence to see the officers there, and gave himself up.

At the trial the appellant's testimony did not differ very greatly from the foregoing account he had given the officers. He declared again that Mrs. Miller said she was ''going to end it all'' and reached down into the pocket of the car where he carried the pistol, and started to open the door. He put both arms around her between her shoulders and elbows, but he could not remember whether his arms were over her arms or under them. A shot was fired and she fell out the door. He did not fire the shot. She was the one that had the pistol. He left the body lying in the road, drove west to a place where he could turn around, then drove hurriedly back east past the body to Brookfield and went home to his wife. He and she started back down to the scene of the tragedy, but after they had gone a

ways she declined to go further. Then they turned around and went to Marceline to the home of his brother arriving there about five o'clock. About seven o'clock, or after, they went up town to look for Night Watchman Rusher but were unable to find him. They returned to the brother's home and after two or three hours went back to town and found Rusher, whereupon the appellant surrendered the pistol.

On cross-examination he said he and Mrs. Miller had had two or three drinks on their ride in the country, but that he was not drunk. He declared it was his practice to drive around with a pistol in the pocket of the car and that sometimes he would neglect to keep the safety catch engaged. He could not remember whether he got his arms clear around Mrs. Miller, but he did not make an attempt to get hold of the pistol because it all happened too quickly. She had both hands on the pistol. He was seated in the car at the time facing her (the other evidence shows he was at the wheel on the left side of the car, which faced west, and Mrs. Miller was on the right). She had got the car door open, but it was only partly open —just a crack. The right side of the car was on the outside of the road, but there was snow, and he could not say whether the car body leaned to the north with the crown of the road so the door would naturally swing out. She was sitting in the seat facing the front and fell from that position when the shot was fired.

The appellant was corroborated by his wife in his testimony that he came home the afternoon of the homicide, and that she drove part way to the scene of the shooting with him and then refused to go further, whereupon they drove to the home of appellant's brother in Marceline. Both she and the brother, George Mason, further corroborated the appellant's testimony concerning his efforts to find the marshal and surrender the pistol. For the defense it was also shown by one witness, Howard Hubbard, a fellow employee of appellant's in the shoe factory at Brookfield, that a few days before the homicide he heard the deceased tell the appellant she wanted him to leave with her, and if he did not she could not live on the life she was living. This witness and another fellow employee of appellant's, Clifford Crawford, further testified it was his custom to carry a pistol in the pocket of his car. A number of witnesses testified the defendant's general reputation as a peaceable, law-abiding citizen was good.

In rebuttal it was shown by the State through a number of witnesses that the deceased was a woman of cheerful disposition without suicidal tendencies; and there was testimony that she was not familiar with the use of firearms.

On a consideration of all this testimony we are constrained to hold the State made a case sufficient to support the verdict of the jury.

We are familiar with the many cases holding that when the evidence to support a conviction is wholly circumstantial, the facts must be consistent with each other and with the hypothesis of the defendant's guilt, and inconsistent with any reasonable hypothesis of innocence. But here it is established that the death of the deceased resulted from a pistol shot fired either by the appellant or by her. In view of the fact that a crisis had been reached in the relations of the appellant and the deceased the night before, when his wife confronted them with two policemen; and in view of the appellant's declaration at that time that he was through with his wife and doubted the paternity of his own child, it is evident he had been brought to a place where desperate acts on his part might be expected, one way or the other.

It is true that the night before he had made his choice and said he would abandon his wife and child; and the next day he again sought his paramour. But he had sent word to his employer that he would be absent from work; he bought cartridges for his pistol; and he took her out for a ride on a muddy country road in the cold and there was engaged in conversation with her when Mr. Tolen overtook them. He told her then, in her distress, that he would not go with her. After the shooting he left the body lying in the snow, and drove back past it as he went to Brookfield to his wife. For all he knew it might have remained there indefinitely. It is hard to believe a guiltless man would have abandoned the remains of a woman he loved in the circumstances.

Next, the nature of the wound, itself, the bullet entering the skull nearly three inches behind the ear and coming out on the other side of the skull, raises a serious doubt as to its self-infliction, when it is remembered the appellant says he did not have a hold on the hand in which she held the pistol. If he had, it is conceivable that he might have pulled the weapon back to a point such that the bullet would have entered at that place and angle. The great amount of blood in the car makes it improbable that the woman shot herself and immediately fell out of the door as the appellant testified. Then, there is the testimony as to the bruises on her throat. And it seems unlikely the door would have remained open "just a crack" during the struggle if it was unlatched. Bringing to the case the best judgment we can summon, we must hold that the facts support the conviction and that the judgment should be and accordingly is affirmed. All concur.