THE STATE v. SAM GOFFSTEIN, Appellant.—116 S. W. (2d) 65.

Division Two, May 3, 1938.

*Cullen, Storckman & Coil* for appellant.

*Roy McKittrick,* Attorney General, and *W. J. Burke,* Assistant Attorney General, for respondent.

COOLEY, C.—Appellant was convicted of the crime of receiving stolen property, to-wit, eighteen batteries of the value of more than $30, knowing same to have been stolen, was sentenced to three years' imprisonment in the penitentiary and has appealed. By his brief here he presents two questions: First, the sufficiency of the evidence and, second, certain matters pertaining to the qualification of the jury.

Fifty Willard batteries, of the approximate wholesale value of $5 each, were stolen on or near December 1, 1934, from the Central Battery Company, Inc., in St. Louis. The place was burglarized and the larceny was committed personally by John Williams, a colored man who had served time in the penitentiary. Eighteen of the batteries were later recovered from Rothman Brothers, of St. Louis, dealers in such merchandise. These eighteen had been sold to Rothman Brothers by defendant and are the eighteen here involved. There is no question about the identification or that said property had been stolen.

The State's principal witness was said John Williams, who testified in substance and effect that:

He and defendant had known each other several years. He had worked for defendant occasionally at odd jobs, such as washing his car, etc., and had sometimes driven defendant's car. He owed defendant some $35 for having furnished him bail bond on some criminal charge. He said that he and defendant talked about "getting some batteries," "I was supposed to do that, to make payment on that bond;" that thereafter he and defendant, in defendant's car, drove by said Central Battery Company's place of business and defendant said there was the place to get the batteries. He went there that night but did not then commit the larceny. Evidently conditions did not seem propitious. Next night he went back. He had seen several loaded trucks drive into the building in the afternoon or evening. After dark he effected entrance through the skylight, opened a rear door, drove out a truck loaded with fifty batteries, including the eighteen in question, and drove to a garage operated

by a friend of his named Giles. He there "cached" the batteries and drove the truck to a street some distance away, where he abandoned it, and then went home. Next day he notified defendant he had the batteries and during that day met defendant and they went together in defendant's car to Giles' garage. However, before so meeting defendant that day, Williams had taken from Giles' place ten of the batteries and had sold them to one Albright for $20. He told defendant about this sale, but did not give defendant any of that money, and from his testimony it appears that defendant made no protest.

When Williams and defendant arrived at Giles' garage the batteries were not there. Williams testified that Giles said they had been "misplaced" and he did not know where they were. Williams suspected they might be found at a place in East St. Louis where a girl friend of Giles' worked and he and defendant, in defendant's car, went to said place, where, after some inquiry, they found the eighteen batteries here involved, loaded them into defendant's car and took them to Rothman Brothers' store in St. Louis, Missouri. Defendant had previously that day arranged with Rothman Brothers to sell them some batteries. Willams and defendant arrived at Rothmans about nine P. M. Williams said that defendant went in to make the sale, leaving him in the car. The batteries were carried into Rothman's through a back door. On returning to the car after completing the sale defendant gave Williams $19, saying that he had only received $35.

Isidor Rothman, one of Rothman Brothers, testified that the batteries were brought to their place about nine o'clock P. M., "about closing time;" that "the batteries were bought earlier in the day;" that defendant had been at the store once or twice that afternoon and talked with Joe (Isidor's brother) about selling some batteries which, as he understood, defendant said he had picked up as salvage or "distress merchandise," or something of the sort, and had heard defendant and Joe agree on a price of $55; that there were supposed to be twenty batteries; that the batteries were supposed to have been delivered within a few hours, and that when they were brought defendant told him the reason he was so late was that he had had some car trouble; that he started to write defendant a check for the whole purchase price—$50, since there were only eighteen instead of the expected twenty batteries—but defendant asked for cash, saying he needed some money that evening, so he gave defendant $35 cash, all he could then spare, and told him to come back for the balance in the morning; that defendant came back next forenoon and received the remaining $15. (Note:—There is no evidence that defendant had had any car trouble.)

Joe Rothman, one of Rothman Brothers, testified that he conducted the negotiations on behalf of his firm with defendant; that defendant said he had bought batteries at an auction and wanted to dispose of them and they finally agreed upon a price of $55, witness understanding that there were twenty or twenty-one batteries. Joe was not present when the batteries were delivered.

A police officer, Arthur Wander, testified that he had been assigned to investigate concerning the larceny and after the recovery from Rothman by the police of the eighteen batteries he had a talk with defendant at the police station, where defendant had been called for questioning. We quote part of his testimony:

"I said, 'I have got a complaint here that you sold eighteen batteries and some separators and some cables at Rothman Brothers', at Semple and Easton.' He says, 'I think you have got me wrong.' I says, 'Now there were eighteen batteries I recovered out there, and I said, 'The Rothmans stated that they bought them from a man by the name of Sam, and gave me a description which compared with your description.' I said, 'I later got a photograph and showed them your photograph' and they said, 'This is the man we bought the batteries from.' He says, 'No, no, I didn't; you are absolutely wrong.' So I then confronted Isidor Rothman before Sam, and asked Isidor Rothman if he knew this man. He says, 'Yes, that is the man that I have known by the name of Sam, that sold me those eighteen batteries, separators, cables and so forth.' He said, 'I paid him $35.00 the night of the delivery, and $15.00 the next morning.' I said, 'Sam, what have you got to say about it?' He says, 'No, no, no.' So I said, 'Now, this man wouldn't come in and make these statements—he positively identifies you.' He says, 'Can I talk to you alone?' I said, 'Absolutely;' so I had Isidor Rothman and a couple of the boys that was in there—my men—detectives step outside. Detective Stein and I were inside of the office with Sam. I said, 'Now, Sam, you had better clear your skirts,' I says, 'This is a serious case.' I says, 'I know these batteries was positively stolen from the Central Battery Company. We have got them positively identified.' I says, 'You had better tell me where you got these batteries from.' So he says, 'You promise that you will take care of me?' I said, 'No, I can't promise you nothing,' I says, 'You have got to clear yourself, and tell me where you got these batteries.' He said, 'Well, then, you won't take care of me?' I said, 'I am not promising you anything,' I said, 'You had better state where you got those batteries;' and then he mentioned the name of Johnny Williams; he said, 'Don't you know Johnny Williams, the colored kid that has been driving me?' and I says, 'No, Sam, I do not know Johnny Williams,' I said, 'Whenever I seen you you were mostly in the car alone,' I says, 'Can you get in touch with Johnny?' and

he says, 'Yes, if you will let me use the 'phone. I says, 'All right,' and I says, 'You just call for Johnny Williams;' so he said 'All right.' "

Wander then detailed how defendant got in touch with Williams, went for him in his (defendant's) car, first arranging with the officers that they should follow and arrest both so that it would not appear that he had informed on Williams. Both were arrested pursuant to that arrangement and taken to the police station. To preserve the chronology we state here that Williams testified that as they went up the steps to the police station defendant, out of hearing of the officers, cautioned him not to tell anything.

Wander testified further that after he had both men in the police station he separated them, talking first to Williams; that he showed Williams the eighteen batteries and obtained from him a written statement; that he then called defendant and confronted him with the statement Williams had made; that after reading the statement defendant said, "The nigger is a damned liar. If he made that statement he is doing too damned much talking." Defendant on that occasion declined, as he had a right to do, to make a statement himself (other than what we have above indicated), and made no explanation of his possession or sale of the batteries. Said written statement of Williams was not introduced in evidence and is not before us.

Defendant took the witness stand and testified in substance:

That Williams told him he and a partner at a garage had split up and he had some batteries which he wanted to dispose of and asked defendant if he could help him sell them; that he told Williams he would let him know, and that afternoon saw the Rothmans, told them he had some batteries, that a party was going out of business, and asked Rothman if they could use the batteries; that Rothman told him to bring the batteries down that evening and if they were all right they would buy them; that he brought the batteries that evening and Rothman bought them; that Rothman agreed to pay $50 for the batteries, and he sold them to Rothman that evening; that Williams carried the batteries into the store; that Rothman paid him at that time $30, that at no time was a check offered him; that he gave the $30 to Williams, who then went home; that the next day, at Rothman's place, he received the remaining $20, and gave it to Williams. He testified that he gave the whole $50 he had received for the batteries to Williams, keeping nothing for himself; that Williams had come to his house with the batteries "that evening,"—which we understand from the record to be the same evening on which the batteries were sold,—in a car, the description of which defendant could not give; that it was Williams' car. (Note:—Williams' testimony was that the batteries were taken to Rothman's in

defendant's car. Williams did not own a car.) Defendant further testified that he sold the batteries for Williams merely as a favor or act of friendship; that, though he felt under no obligation to Williams, the later had occasionally worked for him at odd jobs and had driven his car, and he was willing to accommodate him. He stoutly denied Williams' testimony as to suggesting the larceny, pointing out the place where batteries or tires might be stolen, or any implication in or connection with the burglary and larceny, and claimed that when Williams came to him to get him to aid in selling the batteries he had no knowledge or suspicion that they had been stolen. He testified that he had had no talk with Williams prior to the larceny "about these batteries" or about stealing anything, denied any knowledge that the batteries had been taken to East St. Louis or that they had been brought back from there, including a specific denial that he had hauled or helped to haul them from East St. Louis to St. Louis.

Relative to Wander's testimony as to occurrences at the police station he testified that he heard they wanted him there; that he went and asked Sergeant Wander what he was wanted for; that Wander "told me I sold Rothman some batteries. I said I did, I said the batteries belonged to this colored fellow and I said I done him a favor and I sold the batteries for him." In this and in other material respects his testimony as to what was said at the police station conflicts with that of Sergeant Wander. Defendant further testified that Williams came to his (defendant's) house with the batteries in a car of his own the evening on which the batteries were sold without knowing or having been informed that "the deal was O. K." or that a sale had been arranged and the two then went to Rothmans, where defendant consummated the sale.

The foregoing sufficiently outlines the facts so far as concerns appellant's contention that the evidence is insufficient to sustain the verdict. We will state the facts bearing upon appellant's contention relative to alleged error in regard to the selection of the jury in connection with our discussion of that point.

I. Appellant contends that the evidence does not sustain the conviction because if it tends to show any crime it tends to show that defendant was guilty of the larceny of the alleged stolen goods, on the theory that, under Williams' testimony, defendant conspired with him to commit the theft and was an accessory, and therefore liable as a principal, and that one cannot be convicted of receiving from himself stolen goods of which he himself was the thief; that the crimes of larceny and receiving stolen property are separate and distinct offenses.

Theoretically there is authority for that doctrine. [See State v. Honig, 9 Mo. App. 298, same case, 78 Mo. 249; State v. Willner (Mo.), 199 S. W. 126; People v. Brien, 6 N. Y. Supp. 198.] In State v. Shapiro, 216 Mo. 359, 371, 115 S. W. 1022, it is held that the receiver of stolen goods, knowing them to be stolen, is guilty of an offense separate and distinct from the larceny of the goods.

The Honig case might, we think, be distinguished on the facts. There the defendant, charged with receiving stolen property, was personally present participating in the theft and in fact himself received and took possession of the alleged stolen money when it was placed upon his counter and pushed over towards him by his clerk. The owner claimed he had not intended to surrender possession of his money and demanded it back, which demand the defendant refused. The Court of Appeals said that the defendant's receipt of the money, considered in connection with his previous conduct, "was the consummation of the act of theft," and further said, 9 Mo. App. l. c. 301,

"There can be no ground for contending here, as was suggested in Regina v. Coggins, 12 Cox C. C. 517, that the money was taken without the defendant's knowledge. So, on the other hand, it is equally clear that the defendant was not, as contended by the State, merely an accessory before the fact. It is not merely that he was the principal in the design, who allowed the trick to be played on his premises and through his men and horses, but from first to last he was at hand, and it was he who consummated the offense. He cannot be at the same time a principal in the larceny and, in the legal sense, a receiver of stolen property."

The reasoning of the Court of Appeals was approved by this court in 78 Mo. 249, supra, the case having been appealed from the Court of Appeals to this court as then permitted by law.

In State v. Glazebrook (Mo.), 242 S. W. 928, the defendant was charged with having received stolen tobacco, knowing it to have been stolen. The night following the theft two of the thieves took part of the stolen tobacco to defendant's store where he, evidently, was awaiting their coming. It was shown that the defendant had previously told the persons who did the stealing that "he could use all the canned tobacco they could get." Other facts and circumstances tending to show guilty knowledge were proved. Conviction was affirmed.

On the precise point that one who is an accessory before the fact and may be prosecuted and convicted as a principal, and therefore cannot be convicted of receiving, as from himself so to speak, property for the stealing of which he might have been convicted on the ground of conspiracy to steal it or of having been accessory before the fact to the stealing, there is this difference between the Glaze-

brook case and the instant case, viz.:—In the Glazebrook case, while, —as we think is indicated in the opinion,—the defendant suggested larceny to the men who later committed it and expected them to steal tobacco, he is not shown to have told or shown them where to get it. In the instant case according to Williams' testimony, if all of it be believed, defendant not only suggested the larceny but pointed out the place where it could be committed. The question is close but we shall not further discuss it nor attempt here to determine it because, in our opinion, the determination of the submissibility of the case does not rest upon the solution of that question.

The case was submitted on instructions requiring the jury to find that the batteries had been stolen by someone other than defendant and that thereafter defendant received them, knowing them to have been stolen. We must presume that the jury followed the court's instructions. The jurors were the triers of the facts. We have held that the jury may believe and accept part of a witness's testimony and disbelieve and reject other portions thereof, as it may find same to be true or false when considered in relation to the other testimony and the facts and circumstances in the case. [Gould v. C., B. & Q. Railroad Co., 315 Mo. 713, 723, 290 S. W. 135, 138 (2), citing cases. See, also, Gann v. C., R. I. & P. Ry. Co., 319 Mo. 214, 228, 6 S. W. (2d) 39, 44 (5).] Also, defendant had the right to have his testimony considered. The jury may have believed part but not all of it. If the jury disbelieved Williams' testimony that defendant had, prior to the larceny, urged him to commit it and had pointed out the place where it should be committed, and believed defendant's testimony that that did not occur, there still remain facts and circumstances testified to which, if believed by the jury, justify a finding that defendant knew the batteries were stolen property. Not only are the shown facts and circumstances to be considered but, if Wander's testimony is believed, there are the evasive, and in many respects false, statements of defendant at the police station. [See State v. Glazebrook, supra.] The State's case does not rest alone on the testimony of Williams. We have at length detailed the evidence. Without repeating it we think it sufficient to say that if Williams' testimony regarding the prior conspiracy and tending to show that defendant was an accessory before the fact to the larceny be eliminated there remains sufficient competent evidence to sustain conviction for receiving stolen property.

II. *Selection of jury*:

Appellant in his brief contends that prejudicial error occurred in the selection and qualification of the jury, in that the prospective jurors had been permitted to read inflammatory newspaper articles. It appears that there had been a previous trial of this case at which

the jury failed to agree, one juror, Biederman, holding out for acquittal. It does not appear in the record what publications, if any, were made in the newspapers immediately following that first trial. What does appear is this: On this trial twenty-four men, from whom were to be selected the trial jury, were qualified in the forenoon of the day on which the trial began. When court convened after the noon recess it was noticed that a number of the prospective jurors had newspapers in their hands which they appeared to be reading. The court's attention was called to this fact and the sheriff, at the court's direction, gathered up the papers. There were a number of copies each of the Post-Dispatch and the Star-Times and a few of the Globe-Democrat. In the Post-Dispatch there was an article with bold-face headline "PICKING JURY TO TRY SAM GOFFSTEIN AGAIN," beneath which was a subhead in smaller type reading, "Bondsman, Once Saved by Holdout Juror, Accused of Receiving Stolen Goods." The body of the article read:

"Selection of a jury for the second trial of Sam Goffstein, professional bondsman, on a charge of receiving stolen property was begun this morning in the court of Circuit Judge Frank C. O'Malley.

"A fellow professional bondsman, Leo Biederman, saved Goffstein from conviction at his first trial last November, by refusing to agree with the judgment with the other 11 members of the jury that Goffstein was guilty. A mistrial resulted and Biederman was indicted on a charge of perjury for statements he made in qualifying as a juror that he did not know Goffstein or his attorney, Verne Lacy."

The Star-Times carried a similar article, but with only a single headline reading, "SELECTION OF ANOTHER GOFFSTEIN JURY BEGUN." There was nothing concerning the case in the Globe-Democrat.

When the newspapers had been gathered up, as above indicated, the court called the members of the panel of twenty-four, one by one, and questioned them. Some said they had not seen either of said news items and did not know there was anything in the papers referring to the case. Several said they had noticed the headline (whether or not this included, as to the Post-Dispatch, the subhead above quoted is not clear) and that, remembering that they might be chosen as jurors, they had refrained from reading the articles and did not know their contents. Only three had read either of the articles. Those three all said the articles had not influenced or made any impression upon them, but nevertheless the court of its own motion excused those three and substituted three other men, as to whose qualification no objection could be urged so far as the record shows. Defendant did not object to the court's action in excusing the three men who had read said news items and substituting others nor did he object to or challenge for cause any individual member

of the panel of twenty-four as finally made up. He contented himself with asking, orally, that the entire panel be discharged, which request was denied.

If defendant's motion to discharge the jury panel was intended as a challenge to the array it should have been in writing. [State v. Garrett, 285 Mo. 279, 226 S. W. 4; State v. Vigus (Mo.), 66 S. W. (2d) 854.] But regardless of this the motion was properly denied. Many of the prospective jurors had not read anything in the papers. Of those who had only three had read the articles complained of and they were excused. No one of the twenty-four was shown to have formed or expressed an opinion as to defendant's guilt or innocence or to have been in any way biased. The court properly refused to discharge the entire panel on the showing made.

Another circumstance complained of in appellant's brief in connection with the selection of the jury was this: Mr. Woodward, for the State, asked a juror on *voir dire* examination if he knew a man by the name of Biederman. Defendant objected and the court sustained the objection. Then, by Mr. Woodward: "All right. You have read no article at all, applying to this case, either mentioning the name of Goffstein or Biederman or anybody connected with it?" The Juror: "No." There was no exception by defendant at this juncture. Later Mr. Woodward asked another juror if he had read any newspaper articles mentioning the name Goffstein or Biederman "or any other thing that might occur in this case." The juror answered "No, sir." Defendant renewed his objection to the mention of Biederman's name and the court sustained it, saying that Biederman was not a witness and his name should not be mentioned. Mr. Woodward said "All right." Defendant's counsel then said "Exception to the conduct of counsel." Woodward did not again mention Biederman.

We think it clear that there was no prejudicial error in that *voir dire* examination. There is nothing in the record to indicate that Mr. Woodward was acting in bad faith or from improper motive. He may have thought that the mention of Biederman's name might refresh the memory of jurors as to having read newspaper articles when the name Goffstein would not. In State v. McKeever, 339 Mo. 1066, 1078, 101 S. W. (2d) 22, 27 (6-9), we said: "A liberal latitude is allowed in the examination of jurors on the *voir dire* for the purpose of challenge for cause and, within reasonable limits, for favor;" citing State v. Miller (Mo.), 207 S. W. 797, 798. In the instant case it did not appear that any of the panel of twenty-four knew anything about Biederman or that he was the "hold-out" juror on the former trial or had been prosecuted on account of his connection with that case. As to those matters and the claimed notoriety given the former trial and matters connected therewith

defendant's contentions rest too much upon assumption or conjecture. Moreover, defendant did not except to any action or nonaction of the court in this regard. He excepted ''to the conduct of counsel,'' but asked for no reprimand or for any further ruling or action by the court, for which reason, if for no other, he may not now complain of error on the part of the court. But in any event we think there was no prejudicial error in the *voir dire* examination.

■ We have discussed and disposed of the propositions advanced in appellant's brief. There are some other assignments of error in the motion for new trial, such as the refusal of certain instructions asked by defendant as the converse of the State's main instruction but appellant has not briefed these assignments. Following our recent decisions in State v. Mason, 339 Mo. 874, 98 S. W. (2d) 574, State v. Huett, 340 Mo. 934, 104 S. W. (2d) 252, 253, State v. Watson (Mo.), 104 S. W. (2d) 272, 276, and State v. Reagan (Mo.), 108 S. W. (2d) 391, 396, we shall not discuss such assignments. The information, verdict and judgment are in due form and sufficient.

The judgment of the circuit court is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.

ELLISON, J. (concurring).—■ The holding in division 1 of the opinion is based on the theory that the jury may not have believed the part of the State's evidence showing appellant's conspiratory participation in the theft of the batteries, but may have believed the part showing his reception of them thereafter knowing them to have been stolen. This implies that if the jury had believed all the evidence they could not have convicted him of the crime charged. There is no evidence that he came into possession of the batteries until after the theft was committed by another person. This being true, in my opinion he could have been convicted of receiving stolen property knowing it to have been stolen although there was evidence from which the jury might have believed (and did believe) that he had some indirect connection with the theft.

Without doubt if the appellant had actually stolen the batteries he could not be convicted under Section 4083, Revised Statutes 1929, Mo. Stat. Ann., p. 2886 (the statute upon which the instant charge is based) of receiving them from *himself;* there would be no transfer of possession. But where, as here, the larceny was committed by the negro Williams alone and appellant thereafter received them from Williams with guilty knowledge of the theft, why should he not be liable to prosecution for *that* offense even though *all* the evidence further proved he was connected with the larceny as a con-

spirator in such manner as would have warranted his conviction of larceny as an accessory before the fact under Section 4446, Revised Statutes 1929 (Mo. Stat Ann., p. 3052)? I think he would be, notwithstanding the supposed holding to the contrary in State v. Shapiro, 216 Mo. 359, 371, 115 S. W. 1022, 1025, and other cases cited in the principal opinion. I fully understand that opinion does not follow these cases, but merely lays them to one side and decides the cause on another theory. Yet it seems to me the question is important enough to call for square decision.